[Crim. No. 3486. First Dist., Div. Two. July 21, 1958.]

THE PEOPLE, Respondent, v. THEODORE MONROE, Appellant.

Theodore Monroe, in pro. per., and Duncan Davidson, under appointment by the District Court of Appeal, for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Peter T. Kennedy, Deputy Attorney General, for Respondent.

KAUFMAN, P. J.—By an information dated October 11, 1957, Theodore Monroe and Artis Allen Falkner were charged with armed robbery. The information also charged that each of them had previously been convicted of robbery in the first degree and had served a term therefor in the state prison. Both defendants entered a plea of not guilty. A jury trial resulted in a verdict of guilty. This appeal is taken only by the defendant Theodore Monroe from the judgment of conviction and from the order denying his motion for a new trial. Monroe contends that: (1) The evidence was insufficient to support the verdict; (2) The evidence was insufficient to prove his identification so as to overcome his alibi; (3) The trial court should have granted his motion for a new trial based on newly discovered evidence when Falkner stated that he committed the robbery but that Monroe did not; (4) He was denied due process of law because he was represented by the same attorney as the defendant Falkner who confessed the crime.

The record discloses the following facts: On Sunday, September 22, 1957, William A. Floren, age 17, and his grandfather, Gustave Floren, arrived at the family grocery store, Gail's Market, at a few minutes before 9 a. m. to open the store for business. Gail's Market is located on the corner of Tenth and Keyes Streets in San Jose, California. William took approximately $450 out of the floor safe and placed it on one of the three cash registers in the front of the store. He then turned his back to the door and began putting the Sunday papers together for sale. Suddenly he heard someone say, "This is a stick up." He turned toward the door and saw a Negro dressed in dark clothes, a dark blue baseball cap and dark glasses with a gun in his hand. Meanwhile, Gustave Floren, had gone to the rear of the store near the butcher's section to get the carton in which the butcher's money was kept on Sundays. He was bringing this carton to the front of the store. As he stooped down to pick up some scrap paper, he saw the gunman. The gunman forced both Mr. Floren

and his grandson to go to the icebox in the rear of the store. As they got to the rear of the store, a second Negro appeared. This man was bare headed, dressed in a light colored sport coat or jacket and had a white handkerchief over the lower part of his face. His right hand was in his jacket pocket but the victims did not see a gun. The second man told them to get into the icebox, take their aprons off, and kneel down and put their hands behind their backs. He followed them into the icebox, tied them up. The second man asked William if he knew the combination to the safe. When William replied that he did not know it, the man replied, "Well, you're going to learn it." Then the second man left and tried to lock the door. Shortly thereafter, an elderly customer who had entered the store was shoved into the icebox.

William looked through the glass door of the icebox and saw that the men had gone. He loosened his bonds and untied his grandfather. He ran out, saw that all the money was missing from the cash register, and called the police. The police arrived at the market at about 9:30 a. m. Walter Hinds, who lived across the street from Gail's Market, told the police that at about 9 a. m. he had bought a newspaper from the Florens immediately after they drove up. As he walked home he noticed a Maroon Ford with its motor running parked near Gail's market. There were two Negroes in the front seat of the car. Hinds went home and sat on the front porch reading the newspaper. He noticed that the car was backing up towards the "Trading Post," a second hand store located at 11th and Keyes Streets, one block from Gail's Market, where Hinds worked. Thinking that the occupants of the car might be potential Trading Post customers, Hinds continued to watch the car. The actions of the car's occupants struck Hinds as peculiar; one of them left while the other appeared to be changing clothes. After the second occupant had walked away across Eleventh Street toward Gail's Market, Hinds then crossed the street to the car. Hinds noticed a big bump on the left side of the car, a colored quilt on the front seat, and that the vehicle had no license plate but only a temporary license in the window. Hinds entered the Trading Post and wrote the make, color and temporary license number of the car on a tag. With this information the police found the car in about 20 minutes at 7th and Julian Streets in San Jose. The owner of the car was the defendant Falkner who lived nearby.

William A. Floren further testified that after the robbery, Gail's Market remained open. About one-half to two hours after the robbery, a Negro customer entered. He was dressed in light colored clothes. An ivy league hat was pulled down over his hair line. He also wore glasses. He made about $3.00 worth of purchases and wanted to cash a payroll check for $10.30. William told him that they had just been robbed and he didn't know if they had enough money on hand to cash the check. The customer asked some questions about the robbery and then took the check to William's father. William's father okayed the check and William cashed it. William thought there was something funny about the customer that he had never seen him in the store and that the customer was acting ''real strange'' when he walked into the store, but did not attach any particular significance on the matter at the time.

On the day after the robbery, William and his grandfather identified the defendant Artis Falkner as the first robber with the gun. On the next day, September 24, William picked the defendant Monroe's picture as that of the second robber. Monroe was arrested. At Monroe's home the police found a dark blue baseball cap and sun glasses. The same day, both William and his grandfather again went to the police department and positively identified the defendant Monroe as the second robber. On September 30, 1957, both of the victims attended another police line-up and again identified Falkner and Monroe as the two robbers.

Both defendants took the stand, denied the crime, and offered the defense of alibi. The appellant testified that he lived at a boardinghouse at 1197 North First Street. On the Sunday in question he got up about 9:15 or 9:30 a. m. and put on light colored clothes. He went to Gail's Market in a taxi about 10 a. m. to make some purchases for Miss Williams and Mrs. Lankford who lived at the same boarding house. He stated that although he usually shopped at a market which was nearer, on that day he went to Gail's Market which was four miles away from the boarding house because prices at the local store were too high, and because Mrs. Lankford had told him to go there after he had told her the local meat market was not open on Sunday.

Miss Williams testified that she had asked the appellant to make some purchases; that the appellant left the boarding house at about 10 a. m. and was gone about one hour, but that she did not know when he had gotten up or where he

had been from 9 to 9 :30 a. m. Mrs. Lankford testified that she asked the appellant to make some purchases for her a little before or after 9 a. m. and that he left about 10 a. m. by cab to go to Gail's Market. The cab driver testified that he had picked up the appellant about 10 a. m., took him to Gail's Market, a 12-minute drive and back, and that the fare was $2.30.

At the trial, both defendants had the same private counsel of their choice. After the verdict was returned, the defendant Falkner asked permission to address the court. He stated:

"Your Honor, at this time I want to inform the jury, the District Attorney and my counsel too that, well, as the District Attorney pointed out to the jury this afternoon, no one actually knows what went on there except the individuals that was there. And I was there. But I can't see an innocent man go to prison with me. And Mr. Monroe wasn't there. There was three of us but he was not there. I thought that I could beat this charge and I tried, took it as far as it would go even to a verdict that was brought in but I can't take an innocent man with me and I want to let the jury and everyone know at this time. Thank you."

The court replied: "You two defendants have been very well represented. Your attorney has tried the case with a great degree of skill and understanding. The jury will now be discharged. The court stands adjourned. Goodnight."

Appellant's attorney moved for a new trial on the basis of Falkner's statement. The court postponed the hearing on the motion and sentencing for several weeks, and then stated:

"Upon evidence as submitted here, the Court was under some question in its own mind because at the time of the return of the verdict of the jury, your fellow defendant arose and addressed the court and admitted his own guilt but stated to the Court at that time that you were not present at the offense and were not guilty of that offense. I could not pass sentence on you even with the verdict of guilty from the jury's hands until in my own mind I was satisfied where the truth lay. So that I have continued the matter for several weeks during which time I have had a very careful investigation made as to what the real truth of the matter is. I have been convinced beyond a reasonable doubt that the statement of your fellow defendant that you were not involved in this event was not true. And I am satisfied beyond a reasonable doubt that you were there and that you did engage in this

offense and that you were equally guilty with him. The only difference between you was that he had a gun and you didn't.''

■ Appellant's first contention on appeal is that the evidence is insufficient to support the verdict as it was inherently improbable that he would reenter the store so soon after the robbery and that it was inherently improbable for the victim not to identify him so soon after the crime, but to be able to do so a few days later. Appellant's testimony and that of his witnesses indicated that it was the first time he had shopped at Gail's Market, that in order to effectuate a saving on the purchase of groceries he spent an almost equal amount in cab fare. The victims testified that during the robbery the appellant's head was bare and his face covered up to his nose, while when he later returned to make the purchases and cash the check, his face was bare, but his head was covered to the hairline with a hat. The victim also stated that appellant's conduct in the store was rather strange. It was for the jury to weigh the above evidence, (*People* v. *Ashley,* 42 Cal.2d 246 [267 P.2d 271]) and the verdict indicates that they found appellant's reasons for going to Gail's Market less credible than the victim's reasons for the failure to identify the appellant immediately after the robbery.

■ Appellant's second contention on appeal is that the evidence as to the identification of the appellant was insufficient to overcome his alibi. The only question is whether there is substantial evidence to support the judgment. ■ Before a judgment of conviction is set aside, it must appear that upon no hypothesis whatsoever is there sufficient substantial evidence to support it. (*People* v. *Newland,* 15 Cal.2d 678 [104 P.2d 778].) ■ Both of the victims identified the appellant several times, from photographs, from hearing his voice, from a line-up. Neither one of the appellant's alibi witnesses could account for his whereabouts between 9 and 9:30 a. m. Even though the appellant's own testimony exculpates him, it is up to the jury to decide whether he will be believed. (*People* v. *Borrego,* 211 Cal. 759 [297 P. 17].) We think there is ample evidence to support the judgment of conviction.

■ Appellant next contends that the trial court abused its discretion in failing to grant his motion for a new trial after Falkner's statement that the appellant was not one of the three robbers. ■ A motion for a new trial on the ground of newly discovered evidence is addressed to the sound discretion of the trial court. (*People* v. *Greenwood,* 47 Cal.

2d 819 [306 P.2d 427].) In view of the pleas of not guilty entered by both defendants and the uncontroverted evidence that there were two robbers and not three, we do not think that the trial court erred. Rather, the record indicates that the trial court acted with commendable fairness in postponing the hearing on the motion in order to further investigate the matter. *People* v. *Shepherd,* 14 Cal.App.2d 513 [58 P.2d 970], relied upon by the appellant is readily distinguishable, as there the complaining witness was in doubt as to the identity of the defendant and the State admitted doubt. (*People* v. *Greenwood,* 47 Cal.2d 819 at 822 [306 P.2d 427].) Falkner did not exculpate the appellant when he took the stand, but waited until after verdict. The jury did not believe Falkner's testimony as to his own innocence and alibi. It is useless for the appellant to argue that if Falkner had spoken before the verdict, a different verdict would have been reached in view of the victim's positive and repeated identification of the appellant.

 Appellant's final contention is that he was denied due process of law because he was represented by the same attorney as Falkner, who confessed the crime. As pointed out above, appellant's counsel was of his own choosing. The record indicates that appellant's counsel did not know Falkner would make the statement. Nor is there here any conflict of interest as was the case in *Craig* v. *United States,* 217 F.2d 355. Furthermore, this issue should have been raised below. (*People* v. *Meacham,* 84 Cal.App.2d 193 [190 P.2d 262].)

We conclude that the verdict, judgment and order denying the motion for new trial are all amply supported by the record before us.

Judgment and order denying motion for new trial affirmed.

Dooling, J., and Draper, J., concurred.

A petition for a rehearing was denied August 20, 1958, and appellant's petition for a hearing by the Supreme Court was denied September 19, 1958.