[Crim. No. 3350. Third Dist. Dec. 12, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. ARTHUR DAVIS et al., Defendants and Appellants.

Ronald F. Sypnicki and Joseph A. DeCristoforo, under appointment by the District Court of Appeal, for Defendants and Appellants.

Stanley Mosk, Attorney General, Doris H. Maier, Assistant Attorney General, and Edward Hinz, Deputy Attorney General, for Plaintiff and Respondent.

PIERCE, J.—At between 12:25 and 12:30 a. m. on the morning of November 15, 1961, Ernie's place was robbed. Ernie's is a tavern on the main ("Second") street of the little river town of Isleton. The robbery was committed by two hooded bandits. One of them was a 17-year-old youth, Harold "Buddy" Freeman. Taken into custody later, he turned state's evidence, was granted immunity, and made a full confession. In this confession, and later in testifying, he named as his accomplice in the robbery itself defendant Robert De Louize, and as another accomplice, defendant Arthur Davis, an Isleton police officer on duty on the night of the robbery, whose function in the plot was said to be to keep an eye on Ernie's while cruising in his patrol car, inform the other two when there were no patrons in the tavern, then to be at the other end of town while the robbery was being perpetrated.

Davis and De Louize were charged with robbery, indicted by the grand jury and tried before a jury. Convicted, they moved for a new trial. They appeal separately from the orders denying their motions for a new trial and from the judgments.

Neither defendant contends there was insufficiency of evidence to sustain his conviction. Defendant Davis rests his appeal upon the contention that testimony (including a transcript) of an electronically-intercepted conversation between Davis and one Dean Thompson was improperly admitted in evidence. De Louize bases his appeal upon three grounds,

principal of which is that said appellant, who did not testify on his own behalf, was convicted solely on the uncorroborated testimony of an accomplice, to wit, the said Buddy Freeman. Because of this we will state the corroborating testimony before stating Freeman's.

### The Appeal of Robert De Louize

Other than Freeman, the People's principal witness was the said Dean Thompson, who, although not a party to the conspiracy to rob Ernie's, seems to have been so completely in the confidence of Freeman and the two defendants that their statements and activities in his presence both on the night of the robbery and afterwards were quite uninhibited. Appellants refer to him as a ''stool pigeon;'' we will call him an informer.

Thompson testified that on the night of the robbery he returned from Stockton to Isleton with a friend in the latter's car, observed Officer Davis sitting in his patrol car in front of the Bank of America, two doors away from Ernie's; also on Isleton's main street. This was a point where Davis usually stationed himself when on duty but not patrolling. Thompson's friend dropped him off there and Thompson, as he frequently did, joined Davis in the patrol car, purposing to ride around with him. The time was 11:15-11:30 p. m.

While sitting there, a car owned and driven by Freeman, with defendant De Louize riding in the front seat, drove up. Officer Davis got out of his car and engaged Freeman and De Louize in conversation for a few minutes; then they drove off. Davis then drove around to make a check of the Isleton bars. It was on a Tuesday night, all of the bars closed early; there appears to have been no activity on the streets by the time this check was completed.

Thompson then asked defendant Davis to drive him to a café called Pineapple's to deliver some pictures to a woman employee named Rita. Davis obliged, driving past Ernie's on the way. Pineapple's is in Chinatown on a street which is an extension of the main street of Isleton. It is several blocks away from Ernie's. The two arrived at 12:20. This precise time, stated by Thompson, was corroborated by Davis and was also confirmed by a defense witness, Trinidad Ablog, proprietress of the place. The place was closed. Davis remained in his car; Thompson knocked; Rita came to the door and Thompson talked with her for about ten minutes. (Davis also confirmed this.) During their conversation Thompson saw Freeman and De Louize drive up in Freeman's car (as they had done in

front of the bank an hour before). There was a conversation between them which Thompson did not overhear. Freeman and De Louize drove off. Thompson got back in the car, and he and Davis sat there for a few minutes, Davis writing something on a clipboard. Davis then drove down towards the end of Chinatown. (From the map, this appears to be as far away as one can get from Ernie's and still be in Isleton.)

Meanwhile Freeman and his accomplice were entering the front entrance of Ernie's at just before 12:30.

Al Hemenover testified that no one was in the place besides himself; that he was sitting on a customer's bar stool looking at television; that the two came in wearing pillow slips and looking like the Ku Klux Klan; they were wearing gloves. One of the two men carried a pistol. There were no spoken words. By pantomime Hemenover was directed to lie down on the kitchen floor and his hands were tied together behind him. The cash register (one empty drawer) and safe were then rifled; the total stolen was less than $100. Obtaining a key from a drawer, one of the men locked the front door and both left by the back door. Before leaving one of the men struck the prone bartender with his fist. Hemenover was dazed by the blow. The only description which he could give later of the two men was that they were about 5 feet 8 or 9 inches in height, weighed about 160 pounds;[1] that the one carrying the gun seemed to be the huskier of the two and he was wearing dark pants which Hemenover thought were "Frisco jeans."

After the bandits had left, Hemenover managed, though tied, to phone the Rio Vista police radio operator, asking her to have the Isleton patrolling officer go to Ernie's. At 12:34 this call was put through to Davis.

It reached him, according to Thompson's testimony, when he was driving in the last block of Chinatown on the back street. Davis was in no hurry. "He just drove down there like he was cruising around. . . . [W]e went down one block, back up the main street in Chinatown, and came back down again." When they got opposite Ernie's they went down to the end of the block and made a U-turn to park along the curb in the right direction.

Davis entered Ernie's, untied Hemenover and heard his

---

. [1]Neither height nor weight of either Freeman or defendant De Louize appears in the record. The prosecution sought to bring out that Hemenover's description fitted De Louize. An objection upon the ground that it would fit so many others as to be irrelevant was sustained. The jury, however, had the opportunity to observe De Louize throughout the trial.

account of the robbery. Thompson followed him in. Shortly thereafter Buddy Freeman returned to the scene, sitting on a bar stool with, and talking to, Thompson. The owner of Ernie's arrived and an investigation was carried on. Freeman and Thompson remained during part of this inquiry.

About 30 minutes later Thompson and Buddy left Ernie's and rode around in Freeman's car. Sometime thereafter as they were riding through Chinatown they met defendant Davis driving in his patrol car.

It was dark and it is inferable that Davis, recognizing Freeman, did not recognize Thompson. The two cars stopped and Davis said to Freeman: "I will meet you behind Brazos." (Brazo's is a large warehouse in Isleton.) Davis started up again; then stopped; then backed up and said: "Where's De Louize?" Freeman said, "I'll get him."[2]

After Davis left, Freeman told Thompson: "I have got to meet those guys." He said, "[H]e had to meet Davis and De Louize." Thompson told Freeman he would wait for him in De Louize's car parked in front of the house where De Louize was staying. He was dropped off there; later Freeman returned and the two spent the night in Ryde.

This account was, of course, embellished by Freeman's testimony. Freeman testified to a plan of robbery suggested by De Louize who had mentioned that Davis had told him that Ernie's would be a good place "to hit." Davis had also said that the bartender always went to a storeroom back of Ernie's to replenish the liquor supply at about 1 in the morning. The two planned to lie in wait for Hemenover, force him into the storeroom and then rob the place. Davis told him he would go to the other end of town when the robbery took place. They had made an abortive attempt the night before the actual robbery; but the bartender had not gone out for supplies.

Freeman testified to the two meetings between Freeman, De Louize and Davis on the night of the robbery; the same two meetings which Thompson had reported. He was able to fill in with the conversations which occurred out of Thompson's hearing. He also testified to an earlier meeting with Davis in which the latter had asked about the night before. Freeman and De Louize told him of their unsuccessful attempt and of their intent to repeat the attempt. Davis asked them to let

---

[2] It may be noted here that Freeman's version of this conversation differs in a minor respect. Referring to Davis, Freeman testified: "Well, he looked in the car and asked me if that was Bob? And I told him no, and he never said any more."

him know. Freeman and De Louize drove around between 8 and 10 o'clock, decided to try the robbery again that night. Bob said: "[W]e have to see Art and talk to him about it first." Later they met Davis and "told him we was going to try it that night." Davis asked him how they were going to do it and they told him they were "going through the front door." "He [Davis] said he'd stay on the other end of town." He asked at what time and they told him at 12:30.

Before the Grand Jury, Freeman had testified about the later meeting with Davis before the robbery (and this was brought out by defendant De Louize's attorney on cross-examination): "Q. Where were you when you were watching for customers? [at Ernie's] A. Well, Art [Davis] drove by and said there wasn't anybody in there so we went down. . . . Q. He told you that there was nobody in there, is that right? A. Yes."

It was obvious that this testimony referred to the meeting in front of Pineapple's when Thompson was talking to Rita and Freeman, and De Louize, driving by, stopped and talked with Davis.

Freeman's detailed account of the immediate preparations to enter Ernie's and the information which his testimony added to the bartender's recital of the events of the robbery itself need not be related here. It should be noted that he testified that De Louize was wearing "Levis," a fact corroborated by Hemenover (if "Levis" and "Frisco jeans" are the same or similar).

Freeman explained that his return to Ernie's shortly after the robbery was preceded by his disposal of the red shirt he had worn during the robbery, and of the pillow case and gloves. (He had thrown them into the river.)

Freeman testified to the meeting where Davis told him to get De Louize and meet him behind Brazo's warehouse, substantially as related by Thompson. He also described this meeting and stated that it had been for the purpose of dividing the stolen money three ways. De Louize, however, had hidden the money; had not brought it with him. Therefore, he said, the three met at the "dump" the following day. There a blanket was spread and the three-way division, resulting in each getting about $30, occurred.

■ Appellant De Louize, through able counsel, urges that without the testimony of accomplice Freeman to give it interpretation and direction, the corroborating testimony here is without value and therefore insufficient to sustain a convic-

tion. (Pen. Code, § 1111; *People* v. *MacEwing,* 45 Cal.2d 218 [288 P.2d 257] ; *People* v. *Houtman,* 138 Cal.App.2d 448 [292 P.2d 71].)

We cannot agree with this contention. Our purpose in stating first in this opinion the testimony pointing to the guilt of defendant De Louize other than that of the accomplice Freeman was to demonstrate this. From the testimony of the bartender we know that a robbery was committed by two men of medium height and weight wearing hoods who entered the bar at almost precisely 12 :30 a. m. We know that Freeman was one of them not from his testimony only, but because he was apprehended, taken into custody and confessed. We know that Freeman's accomplice was a man 5' 8 or 9" tall, weighing 160 pounds, wearing dark trousers that looked like "Frisco jeans." From other testimony hereafter to be discussed, it will be made clear that defendant Officer Arthur Davis was a member of the conspiracy to rob Ernie's. From the testimony of Thompson recited above at length, we know that Freeman, Davis and De Louize were conversing together *just two or three minutes before Ernie's was entered* and that the two, when they left Davis, drove off in the direction of Ernie's. We know that Isleton is a small river town which on this Tuesday night was very quiet, with all bars, except Ernie's, closed. True, it is possible that Freeman during that two or three minutes dropped off De Louize and picked up another answering his general description and wearing Levi's and that it was Freeman and this other who entered and robbed Ernie's; perhaps, but not likely.

Appellant argues that mere proof of association is not sufficient corroboration. (*People* v. *Reingold,* 87 Cal.App. 2d 382 [197 P.2d 175] ; *People* v. *Petree,* 109 Cal.App.2d 184 [240 P.2d 327].) But here there is more than mere proof of association: there is proof of association in such close proximity in both time and place as to connect De Louize with participation in the robbery. (*People* v. *Henderson,* 34 Cal.2d 340, 345 [209 P.2d 785] ; *People* v. *Dodd,* 113 Cal.App.2d 682, 686 [248 P.2d 965].)

There is, however, more than that. There is the statement by Davis asking Freeman to get De Louize and join him back of Brazo's. This is not the *testimony* of an accomplice which requires corroboration under Penal Code, section 1111. It is an extrajudicial statement made after proof of the conspiracy by one conspirator against his co-conspirator during the existence of the conspiracy (since the conspirators

had not yet met to divide the stolen money) and relating to the conspiracy. It is therefore admissible against De Louize as an exception to the hearsay rule. (Code Civ. Proc., § 1870, subd. 6; *People* v. *Robinson,* 43 Cal.2d 132, 137 [271 P.2d 865]; *People* v. *Dean,* 66 Cal.App. 602, 608 [226 P. 943].)

There is also the extrajudicial statement of Freeman (not his testimony) to Thompson when he let him off at De Louize's car, stating that he had to meet Davis and De Louize.

It was not necessary that the corroborative evidence prove De Louize guilty beyond a reasonable doubt. If such were required then to offer the testimony of the accomplice would be just so much surplusage. (*People* v. *Griffin,* 98 Cal. App.2d 1, 24-28 [219 P.2d 519].) As stated in the case cited by appellant, *People* v. *MacEwing, supra,* 45 Cal.2d, at page 224:

"The corroborating evidence is sufficient if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the witness who must be corroborated is telling the truth."

Here the trial judge fully and fairly instructed the jury on this subject, including the instruction (at appellant's request) that corroborative evidence must be considered without aid of the testimony which is to be corroborated, and it is not sufficient if it requires the interpretation and direction of such testimony to give it value. There was corroborative testimony sufficient to bring the matter before the jury which reasonably could, and it must be concluded, did, find against appellant within the restrictions of Penal Code section 1111. We cannot disturb the jury's finding.

The next contention of appellant De Louize is that the court should have granted his motion to strike all of the testimony of accomplice Buddy Freeman, a motion made upon the ground that to permit the testimony to stand denied him due process.

Originally Freeman had been charged with Davis and De Louize. At the request of Freeman and De Louize the public defender was appointed to represent both, and Buddy Freeman being under the age of eighteen was certified to the juvenile court where, of course, since proceedings there are not adversary in character, he was under the guidance of the court as well as of his own attorney. (Welf. & Inst. Code, § 680; and see 10 Stanford Law Rev., p. 471; Report Cal. Law Rev. Com., Oct. 1960; *In re Poff,* 135 F. Supp. 224.) Thereafter, as stated above, Freeman turned state's evidence, was

granted immunity, and confessed. When De Louize first appeared in the superior court, Deputy Public Defender Mc-Donell announced that, because of the above circumstances, he felt that he and his office were disqualified to represent De Louize. The court then appointed Joseph DeCristoforo as attorney for De Louize and Mr. DeCristoforo has represented him ably throughout all subsequent proceedings, including this appeal.

It is the theory of this appellant that since a defendant is entitled to legal counsel at all stages of the proceedings, he is effectively denied that right if during the period when he is represented by the public defender that officer is also representing a codefendant who turns state's evidence. Counsel asks: "How then, can this Court stand idly by and condone and ratify the sight of the Public Defender, appointed to represent this appellant who had by his plea of not guilty protested his innocence, actively joining forces with the District Attorney and marching arm and arm with the prosecution in offering evidence against this appellant by actively urging that one of his clients testify against another of his clients. . . ."

In the first place, we find nothing in this record to support the contention of an arm in arm march which he describes. There is no proof that the deputy defender *urged* Freeman to turn state's evidence. On the argument of counsel's motion at the trial the District Attorney represented (and it was not disputed) that Freeman had gone to him directly to discuss turning state's evidence on the morning of November 22d. (The appointment of the public defender to represent him had occurred on November 21st.) Deputy Public Defender Mc-Donell had not then discussed the details of his case with Freeman, although he did *advise* him to turn state's evidence and testify before the grand jury in exchange for immunity. It may also be noted that during the trial, when the district attorney sought to prove the reason for Freeman's action—that it followed advice sought by Freeman from a member of the clergy—strenuous objection was made by counsel for De Louize to any exploration into these reasons, and the objection was sustained.

(This position, impeding any opportunity by the trial court to explore facts bearing on the contention of due process violated, makes it more difficult for us to appraise appellant's protestations at face value.)

If Freeman desired to turn state's evidence, certainly any obligation arising from the attorney-client relationship between the public defender and De Louize did not extend to a requirement that the attorney should dissuade Freeman from doing so.

No conflict of interest appeared when the appointment of the public defender was made. The resignation and appointment of a new attorney occurred early in the proceedings. It is perhaps true that there might have been a stricter deference to proprieties had the public defender resigned as attorney for both De Louize and Freeman as soon as he learned of Freeman's proposed action, leaving it to the successor appointed to represent Freeman to go through the formality of giving the advice which, under the circumstances existing, it was obvious would be given—to turn state's evidence for immunity. But from the fact this was not done it does not follow that De Louize was denied a fair trial. No contention is, or could be, made that preparation of De Louize's defense or representation at the trial was in any way impeded. Freeman's testimony was harmful. Granted. But surely appellant does not contend that had he been properly represented at the outset, his attorney would have *prevented* Freeman from becoming a witness; nor contend that he would have induced Freeman to testify falsely!

In *People* v. *Miller,* 173 Cal.App.2d 659, 662 [343 P.2d 783], where the public defender had been appointed to represent both codefendants, accomplices to a burglary, and during, or at the commencement of, the trial, one of them pleaded guilty and the remaining defendant informed the court he no longer wished to be represented by the appointed deputy because of a conflict of interest between himself and his codefendant, thereafter acting as his own attorney, it was held there was no disregard of appellant's right to representation. (See also *People* v. *Monroe,* 162 Cal.App.2d 248, 255 [328 P.2d 483].)

We find no error in this regard and reject appellant's contention.

The last contention of appellant De Louize is the prejudicial effect of certain evidence admitted solely against the codefendant, Arthur Davis. This evidence was a transcript of a conversation between Thompson and defendant Davis at the latter's apartment five days after the robbery; a conversation broadcast by means of electronic equipment concealed on Thompson's person.

In this conversation Thompson, undoubtedly by direction

of the district attorney, introduced the subject of the robbery, stating that an unnamed (but identified) "kid," an acquaintance of Freeman, was talking, having learned about the crime from Freeman. During the discussion Davis made no effort to deny or conceal his own participation in the robbery, specific incidents of which are described. Numerous references are made to De Louize as a participant in the conspiracy. It was a prolonged conversation. (The transcript thereof is 14 pages.) It showed that it had been a part of the plan that Freeman was to leave the area immediately after the robbery and a material part of the discussion was a diatribe delivered by Davis in f'c'sle language against Freeman for not having departed and for his garrulity. Davis remarked that if he had known Freeman would talk he'd have disposed of him by throwing him in the river. There were statements that since De Louize had disposed of the gun and there were no fingerprints, there would have been no possibility of detection except for Freeman's propensity to talk. Davis also stated that he had told De Louize to find Freeman and instruct him to leave the area and head "for the wide open spaces," and that if Freeman were to return to Isleton "if I see him before he gets to town he'll never make it in here." This was clarified by the threat later in the conversation that Davis would throw him in the river. The conversation, near its end, contains the plaintive lament: "THOMPSON: Boy, for a lousy forty bucks, huh, Art? DAVIS: Yeah."

This conversation, as stated above, was admitted in evidence only against defendant Davis, and the jury was repeatedly admonished not to consider it as evidence implicating De Louize. The latter's counsel, however, points out that the transcript with 28 references to De Louize was read to the jury during the taking of evidence, upon argument, and later during the jury's deliberations at its request—altogether five times; and he argues that no amount of admonition could have erased the impact of the conversation to fix the guilt of De Louize as well as Davis' guilt.

The Attorney General cites *People* v. *Santo,* 43 Cal.2d 319, 331-332 [273 P.2d 249], holding that a defendant is not entitled as a matter of right to a separate trial (here De Louize did not ask for one) ; that "a motion for a severance must be decided upon the showing made at the time of the making of the motion" and that it "is not necessarily an abuse of the trial court's discretion to refuse a motion for separate trials

made on the ground that damaging testimony admissible against one defendant and not admissible against another may be received; *in the absence of a strong showing to the contrary* it is to be presumed that an instruction . . . sufficiently protects the defendant.'' (Emphasis supplied.)

Under some circumstances a trial court would abuse discretion in denying separate trials to obviate a jury's hearing damaging testimony against the defendant seeking separation. We doubt if it would be possible for a jury, in a close case, to listen to a conversation relating the criminal activities of two conspirators, evaluating such evidence as to one of them and divorcing it from consideration as to the other. It would be unrealistic to expect the human mind so to function. As stated by Justice Cardozo[3] in a somewhat different context: ''Discrimination so subtle is a feat beyond the compass of ordinary minds. The reverberating clang of those accusatory words would drown all weaker sounds.'' Here, however, several factors intervene, not only to dilute the effect of the evidence, but to preclude a reversal:

First is the fact that no motion for a separate trial was made. We cannot assume that the defense was unaware of the existence of the transcript and its contents prior to the trial; not with the avenues of discovery open to the defense under modern rules of criminal procedure; therefore the absence of any motion appropriately timed seems to imply that the consequences from the admission of the evidence now urged as direful, were weighed against possible advantages calculated to flow from the joint trial, and a deliberate decision made not to seek separation.

Secondly, it is by no means clear to us that the evidence properly had to be limited in its admissibility to the defendant Davis. We have cited above the rule that, after proof of the conspiracy, the extrajudicial statements of one conspirator against his co-conspirator in furtherance of, and relating to, the conspiracy, was made during the existence of the conspiracy are admissible as an exception to the hearsay rule, even though the defendant against whom the evidence is sought to be used is not present. Were the statements by Davis made during the conspiracy and were they in furtherance of its aims? When does the conspiracy end? Does it end when the conspirators meet and divide the spoils? Or does it continue so

---

[3] (In *Shepard* v. *United States*, 290 U.S. 96, 104 [54 S.Ct. 22, 78 L.Ed. 196] quoted in the dissenting opinion of Justice Traynor in *People* v. *Alcalde*, 24 Cal.2d 177, 189, 190 [148 P.2d 627, 633].)

long as plans formulated to make good an escape are still incomplete? An article, *Developments in the Law; Criminal Conspiracy,* 72 Harvard Law Review, pages 920, 960, points to the difficulties in deciding when a conspiracy terminates, and, in discussing such terminations as affecting the running of the statute of limitations it refers (on page 962) to cases where conspiracies to achieve a single object have been held not to terminate (to start the statute running) "until the last overt act of concealment." And the author states: "This is technically justifiable since in every conspiracy there seems to be implicit an understanding that each member do his part to conceal the collective guilt." (It is stated that some cases have limited the rule's application to those instances where the agreement to conceal is *explicit.*) ██ In California in *People* v. *Wells,* 187 Cal.App.2d 324 [9 Cal.Rptr. 384], which involved an *act* of conspirators (other than defendant) in attempting an escape, it was said (on p. 330) quoting from Fricke on Criminal Law (7th ed.), pp. 123-124:

" 'While it may not be expressly so agreed, it is obviously tacitly understood by the persons who conspire to commit a criminal offense, and the law is justified in assuming, that the conspiracy includes the evading and resisting of arrest and acts done to that end. [Citation cases.]' "

██ The *Wells* case is also authority for the rule (expressed on pages 329 and 330 thereof) that "[i]n criminal cases it is not necessary to plead the conspiracy as a basis for imputing the act of one conspirator to all of them."

In *Zamloch* v. *United States* (9th Cir.) 193 F.2d 889, the facts of which are strikingly similar to the case at bench where an informer was equipped with an electronic transmitting device and instructed to engage one of the conspirators in conversation (defendant not being present) stating in said conversation that another conspirator was threatening to "go to the United States Attorney and tell all" and where the conspirator stated that if she did so causing "him to be imprisoned he would kill the s.o.b. himself," and where the same conversation revealed the past acts of the conspirators (involving a trafficking in narcotics) and implicated the defendant, it was held that a wire recording of the conversation was admissible against defendant.

██ Under these authorities it would seem not to have been error to admit the conversation here as against both Davis and De Louize. When De Louize therefore received the benefit of admonition to the jury from the court that it was not

to consider this evidence against him, it was one to which he was doubtfully entitled.

Thirdly, this is not a close case. As we have shown, the testimony of an eye witness who saw De Louize and Freeman conversing with Davis less than five minutes before the robbery, plus the testimony of the same witness overhearing plans of two of the conspirators after the robbery to get De Louize and meet behind Brazo's, plus the testimony of accomplice Freeman, all combine to create a mountain of proof of guilt. And to the jury even any possible imaginary doubt must have disappeared when defendant De Louize failed to testify in explanation of evidence so devastatingly conclusive. [█] It is settled that a defendant's failure to testify, while it cannot be used to fill a gap in the prosecution's case may, when there is no gap, be considered by the jury as tending to indicate the truth of evidence introduced against him. (*People* v. *McFarland* (November 20, 1962) 58 Cal.2d 748, 757 [26 Cal. Rptr. 473, 376 P.2d 449].) █ The jury, by the time it reached consideration of Davis' statement, must, as reasonable men and women, have been already so thoroughly convinced of the guilt of De Louize that its effect was negligible.

Alice Hoover, an aunt of De Louize, was produced as a rebuttal witness by the prosecution in an endeavor to prove that defendant Davis had sought to have her establish an alibi for De Louize. The evidence was admitted against Davis, not against De Louize. Appellant De Louize cites this as error augmenting the prejudicial effect of the error claimed above and for the same reasons. The witness did not affirm that Davis had sought to establish the alibi and although this was to some extent impeached, the testimony as a whole was of negligible value. Appellant De Louize was not prejudiced.

## The Appeal of Arthur Davis

As stated above, when Thompson and Davis held their conversation five days after the robbery in Davis' apartment, Thompson was accoutered with electronic equipment. The device used was a Fargo radio transmitter. It had been installed on his person by Robert Gainsley, a statement reporter for the district attorney's office, who was also established to be an expert in the functioning and use of this particular equipment. It had been installed, tested and found to be in working order shortly before Thompson had been sent by the police and representatives of the district attorney to talk with Davis. Receiving equipment was then set up in the home of Isleton

Chief of Police Burwell, about two blocks away from the Davis apartment.

When Davis met Thompson he *invited* him into his apartment. The conversation held there, as it was broadcast by the Fargo transmitter, was received and recorded on a disc. Simultaneously, the electronically-received conversation, audible to Gainsley, was relayed by him by dictation into a ''Stenomask'' and recorded by a machine not connected with the one which received the broadcast conversation. Gainsley recognized the voice of Thompson; he did not know Davis to identify his voice. A transcript of the latter recording was admitted into evidence.

The foundation laid for its introduction, in addition to the qualification of Gainsley as an expert, and the preliminaries stated above, was testimony by Thompson who affirmed that he had read the transcript and that it correctly recorded the entire conversation between Davis and himself. Then Gainsley testified he had prepared the transcript from the recording made by him through the Stenomask, that he had checked it with the direct recording made (which because of outside interference was less audible than the second recording) and he affirmed that the transcript was a full and accurate verbatim report of the actual transmitted conversation.

Appellant Davis does not contend error because of the deceptive means by which he was induced to divulge his complicity in the conspiracy to rob Ernie's. Although evidence obtained by electronic eavesdropping accomplished by acts which constitute a trespass has been held inadmissible in *People* v. *Tarantino,* 45 Cal.2d 590 [290 P.2d 505], as being evidence obtained by illegal search and seizure under the principles of *People* v. *Cahan,* 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513], it nevertheless has been held that ''[w]here the entry is by invitation of the defendant, a secret recording of a vis-a-vis conversation is not inadmissible . . . whether the recording be by means of a self-contained recording device [citing cases] or by means of a concealed wireless transmitter where the recording is made at another location [citing cases].'' (*People* v. *Albert,* 182 Cal.App. 729, 736 [6 Cal.Rptr. 473] (hearing denied). In *People* v. *Wootan,* 195 Cal.App.2d 481 [15 Cal.Rptr. 833], it was also held that the party to the electronically recorded conversation could use a transcript thereof to refresh his memory of said conversation even though portions of the record from which the transcript was made were unintelligible.

Appellant Davis contends (1) that a proper foundation was not laid for the introduction of this evidence because (a) it was not shown that Gainsley who prepared the transcript was physically present at the conversation and (b) he could not identify both speakers; (2) that the transcript used was not the best evidence since a recording had been made, and (3) that the transcript improperly refers to "Davis" as one of the parties to the conversation. None of these contentions can be sustained.

 Physical presence of the reporter of a conversation is not required. In *People* v. *Goodman*, 159 Cal.App.2d 54 [323 P.2d 536], at page 62, it is stated: "When the identity of the party against whom a telephone conversation is sought to be admitted has been established by some evidence, either direct or circumstantial, the conversation may be shown in the same manner, and with like effect, as conversations had between individuals face to face."

There is no reason why the same rule should not be applied to messages transmitted by radio. It is not necessary that a party to a conversation be identified by the witness reporting the conversation. Any other method which satisfactorily identifies him is sufficient. (*People* v. *Sica*, 112 Cal.App.2d 574, 588 [274 P.2d 72].) Here Gainsley recognized Thompson's voice and the identity of Davis was established by Thompson—and by Davis himself. His testimony will be described below.

 The best evidence rule was not violated. Where the choice was between a recordation of a conversation and one of its participants it has been held the best evidence rule is inapplicable and the testimony of one of the parties to the conversation is primary evidence. (*People* v. *Sweeney*, 55 Cal.2d 27, 37-38 [9 Cal.Rptr. 793, 357 P.2d 1049]; *People* v. *Kulwin*, 102 Cal.App.2d 104, 109 [226 P.2d 672].) Also sound recordings themselves have been held admissible. (See note in 58 A.L.R.2d 1024, including California cases cited on p. 1029 thereof.) Here a transcript made by a competent stenographic reporter reporting the conversation verbatim as it progressed and came over the air was introduced "to refresh the memory" of one who listened to its reception and was therefore effectually a participant. The accuracy of the transcript was confirmed by one of the parties to the conversation; and also its accuracy was tacitly admitted by the other party thereto—the defendant Davis. It would be a strange rule indeed which excluded a means of recording a conversation

which has been accepted for generations as the most accurate method of reporting court proceedings. Even a transcript made by a police stenographer from (apparently) longhand notes by police officers receiving an electronically transmitted conversation has been held admissible to refresh memories. (*People* v. *Sica,* 112 Cal.App.2d 574, 587 [247 P.2d 72].)

Davis and Thompson, having each been positively identified as the speakers, as shown above, there was, of course, no impropriety in inserting their names in the transcript before each separate statement to identify the utterer of such statement and so that the transcript could be intelligently read.

Davis took the stand in his own defense. He freely admitted that he had had a conversation with Thompson in his apartment, but excused the inculpatory statements made therein upon the ground that he had been told by Police Chief Burwell that if Thompson talked to him he was to "play along with him," the meaning of which phrase "[h]e wouldn't explain . . . to me." On cross-examination the transcript of the conversation was read to Davis page by page, Davis was questioned as to its accuracy and made such replies as "I'd say it was along that line;" "I remember faintly on that, yes sir;" or "I'd say most of that, yes sir. . . . I recall part of that." Actually the only part of the conversation which Davis denied was the vulgarity.

Proper foundation for the introduction of the transcript was made, it was properly admitted, we find no other error in the record.

The purported appeals from the orders denying motions for new trial (such orders being nonappealable) are dismissed. The judgments are affirmed.

Peek, P. J., and Schottky, J., concurred.

The petitions for a rehearing were denied December 28, 1962, and the petition of appellant De Louize for a hearing by the Supreme Court was denied February 6, 1963. Peek, J., did not participate therein.