UNITED STATES, Appellee,

v.

Joann C. NEWAK, Second Lieutenant,
U.S. Air Force, Appellant.

No. 46098.
ACM 23544.

U.S. Court of Military Appeals.

July 13, 1987.

For Appellant: *Faith A. Seidenberg, Esq.*
(argued); *Louis P. Font, Esq.* and *Major
Alexander S. Nicholas.*

For Appellee: *Lieutenant Colonel Robert E. Giovagnoni* (argued); *Colonel Kenneth R. Rengert* and *Major Robert E. Ferencik, Jr.* (on brief); *Captain Brenda J. Hollis.*

*James R. Klimaski, Esq.* (argued);
*Charles T. Bumer, Esq.* and *Carol L. Delton, Esq.* (on brief)—For Military Law Task
Force of the National Lawyers Guild.

*David W. Webber, Esq.* (on brief); *Abby
R. Rubenfeld, Esq.*—For Lambda Legal Defense and Education Fund, Inc.

## OPINION

EVERETT, Chief Judge:

Second Lieutenant Newak was tried by a military judge sitting alone as a general court-martial on charges that she used, possessed, and transferred marijuana; possessed amphetamines; attempted to transfer amphetamines by transferring a substance which she erroneously believed was amphetamine (2 specifications); attempted to use amphetamines by using a substance which she erroneously believed was amphetamine; committed sodomy with an enlisted woman (3 specifications); and engaged in conduct unbecoming an officer with a woman enlistee, in violation of Articles 134, 92, 80, 125, and 133, Uniform Code of Military Justice, 10 U.S.C. §§ 934, 892, 880, 925, and 933, respectively. Despite

her pleas, appellant was convicted as charged and sentenced to dismissal from the service, confinement for 7 years, and total forfeitures.

In his review, the convening authority disapproved the guilty findings as to one of the attempted transfers and the attempted use of amphetamine, and he modified the finding of possession of amphetamines to a finding of attempted possession. In all other respects, he approved the trial results, except for reducing the period of confinement to 6 years.

The Court of Military Review affirmed the approved findings and sentence. 15 M.J. 541 (1982). Thereafter, the Judge Advocate General remitted all confinement in excess of 3 years.

In her petition to this Court, Newak complains that she was denied the effective assistance of counsel and due process of law by certain actions against her interest taken by her defense counsel. According to appellant, a conflict of interest arose because the same counsel represented both Newak and the enlisted woman, Airman Lynne Peelman, with whom she allegedly had sexual relations. 18 M.J. 112. We agree.

I

Sometime in the summer of 1981, an informant implicated appellant and Peelman in various homosexual and drug activities at Hancock Field, New York. Both were called in by an agent of the Office of Special Investigations (OSI) and advised of their rights, whereupon each denied the accusations.

When they were notified later of impending charges against them, both appellant and Peelman were informally assigned to Captain John Powers, then the area defense counsel stationed at Griffiss Air Force Base, New York, and responsible for Hancock Field. Powers saw the women separately and formed an attorney-client relationship with each.

In "late August or early September," Powers was notified that he was to transfer duty stations and that Captain Raymond Smith would assume his role as area defense counsel. Although Smith was not formally assigned to Powers' job until November 1, 1981, Powers sought earlier to acquaint Smith with local procedures and personnel, as well as with the cases he would be leaving behind—including appellant's and Peelman's. At some point, probably early in October, Powers introduced Smith to appellant and to Peelman. He included Smith as co-counsel in meetings with these two clients, discussed the cases with Smith "on several occasions," and turned over his investigative case files to him. Smith later consulted alone with appellant and with Peelman and entered into an attorney-client relationship with each.

When he was asked at appellant's trial why he had undertaken to represent both appellant and Peelman, Captain Powers responded:

> Well, at the time, there were not charges yet preferred in the beginning stages. They were both under investigation, and they were both in the same position, so to speak, and there was no—at this time, no offer of immunity or anything like that, and at that time, I didn't see the need to split it up and I didn't split it up.

Powers subsequently did acknowledge, however:

> Well, honestly, I saw a potential problem if immunity was offered to one or the other, and I remember discussing with each of them that it could be a problem that sometime, down the road, the government may offer immunity to the other, but at that time, that was just speculation and there had been no mention by the legal office or anybody representing the Government.

As the investigation proceeded through the middle of October, attention focused on appellant. To effectuate the planned prosecution of Newak, the base staff judge advocate, Major Carlos Torres, met with Smith on or about October 20 and informally discussed with him possible testimonial immunity for Peelman. Torres informed Smith that he intended to recommend to

the convening authority that Peelman be granted this immunity, and he advised Smith to counsel Peelman to cooperate.

The record is not entirely clear how active was Smith's role in the discussion of immunity with Torres. The Court of Military Review concluded, and the Government argues before us, that the decision to grant Peelman testimonial immunity was unilaterally made by the Government and simply announced to Smith. However, Smith's own testimony tends to support appellant's contention in this Court that it was not quite that cut-and-dried:

Q: Did you bring up the subject of immunity?

A: With whom?

Q: With the Base Staff Judge Advocate?

A: Not directly, no. They brought it up to me.

Q: And was there any bargaining on your part, between acting for Airman Peelman vis-a-vis the Base Staff Judge Advocate at Hancock?

A: I don't quite understand.

Q: In other words, did you say—did you go in and say, "If you'll give us immunity, no prosecution of Airman Peelman, Airman Peelman will roll on Lieutenant Newak," or anything like that?

A: *No, not directly. It was back and forth.* They were trying to figure out who to work out immunity with. *I was dealing with my client Airman Peelman! as to whether or not that is what she wanted me to work out for her.*

(Emphasis added.)

Smith later told Powers of his October 20 conversation with Torres, and together they contacted Lieutenant Colonel Sweeney, the chief circuit defense counsel, to discuss a possible conflict of interest. Smith continued to represent Peelman; but, on October 23—prior to the formal

grant of immunity to Peelman on November 17—he withdrew as counsel for appellant at Sweeney's direction, and new counsel was assigned to her.

Sometime while he still represented both women, or shortly thereafter—the record is in conflict—Smith met with Peelman and urged her to cooperate under the expected grant of testimonial immunity. Smith probably told Peelman that appellant was "going down the tubes" and that she should limit her own problems by staying away from appellant and cooperating with the prosecution. Indeed, Smith himself ultimately admitted at appellant's trial that, while representing Peelman, his advice to her to cooperate under the anticipated grant of testimonial immunity may have been affected by confidences entrusted by Newak, as was revealed by this colloquy with the military judge:[1]

Q: Were you ever told by Captain Powers what Lieutenant Newak's version of what the potential offenses was?

A: Yes, sir.

Q: So, Captain Powers did relate to you what Newak, what Lieutenant Newak had told him about these offenses?

A: Yes, sir.

Q: Did you ever reveal this information that Captain Powers told you about Lieutenant Newak's version of the offenses, to Airman Peelman?

A: Not consciously, sir.

Q: What do you mean by not consciously?

A: I never took that information and directly related to Airman Peelman.

Q: Do you feel that you might have unconsciously done so?

A: I feel that that information may have impacted on my conversations with Airman Peelman.

---

1. There is some indication in the record that appellant's confidences held by Captain Smith may have played a more direct role in his advice to Peelman. When it became apparent during litigation of this matter that Peelman was not going to appear in the courtroom, notwithstanding her being directed to do so, the military judge admitted into evidence defense counsel's proffered affidavit from Peelman in which, according to defense counsel, Peelman stated "that Captain Smith openly discussed Lieutenant Newak's case with her and, 'He was glad to have me as a client and not her.'" For some unexplained reason, though, this affidavit is not included in the record as an exhibit.

Q: In what way?

A: Well, after I was separated from Lieutenant Newak, the possibility of immunity came up for Airman Peelman, and I knew some things about Lieutenant Newak that may have influenced how I recommended to Airman Peelman that she should go.

In due course, Peelman became the chief prosecution witness against appellant on a number of the charges against her; Peelman herself never was formally charged or prosecuted.

## II

The Court of Military Review, after acknowledging that "[t]he rule that an attorney cannot represent conflicting interests is one that courts strictly enforce," concluded nonetheless that this rule had not been violated here. It did so,

> not[ing] that the conflicting interests were identified early in the proceedings and a new attorney was appointed for the accused *before* charges were preferred. *See People v. Davis*, 210 Cal. App.2d 721, 26 Cal.Rptr. 903 (1962). We find it significant that Captain S did not represent the accused at either the pretrial investigation or at the trial itself. *Cf. United States v. Davis*, 3 M.J. 430 (C.M.A. 1977)(defense counsel cross-examined a former client at trial).

*United States v. Newak, supra* at 543. In our view, the court below relied too heavily on the timing of Captain Smith's dual representation and was not sensitive enough to the nature of that representation and its subsequent impact on appellant's trial.

## III

This Court has recognized that merely because two or more defendants are represented by the same attorney or

attorneys "is not *per se* violative of constitutional guarantees of effective assistance of counsel," *Holloway v. Arkansas,* [435 U.S. 475] at 482, 98 S.Ct. [1173,] at 1178 [55 L.Ed.2d 426 1978], and does not automatically raise an appearance of conflict of interest. Indeed, frequently it may be advantageous for the co-accused to be represented by the same counsel.... As Mr. Justice Frankfurter recognized long ago: "Joint representation is a means of insuring against reciprocal recrimination. A common defense often gives strength against a common attack." *Glasser v. United States,* 315 U.S. 60, 92, 62 S.Ct. 457, 475, 86 L.Ed. 680 (1942)(dissent). Indeed, "[w]e all hang together, or we all hang separately" could be—in the proper case—successful and pragmatic strategy on the part of co-accused. Therefore, it is clear that duality of representation alone is not necessarily violative of the Sixth Amendment.

*United States v. Breese,* 11 M.J. 17, 19 (C.M.A. 1981).

Nonetheless, as the United States Supreme Court has observed, "a possible conflict [of interest] inheres in almost every instance of multiple representation." *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1703, 1718, 64 L.Ed.2d 333 (1980). Accordingly, a defense counsel must be wary of potential conflicts in any instance of multiple representation.

Captain Powers acknowledged that he was aware at the outset that a conflict of interest might develop "down the road" between appellant and Peelman should one of them be offered immunity[2] and that he discussed this potential with his clients.[3]

---

2. In view of the totally private nature of several of the charged acts, Captain Powers' study of the OSI investigative files apparently indicated to him from the beginning, as Major Torres subsequently concluded, that successful prosecution of either appellant or Peelman probably would depend on some sort of immunity being granted to the other.

3. Although the sixth-amendment right to counsel does not necessarily attach in the military until preferral of charges, *United States v. Wattenbarger,* 21 M.J. 41, 43 (C.M.A. 1985), *cert. denied,* —U.S. ——, 106 S.Ct. 3272, 91 L.Ed.2d 563 (1986), it cannot be gainsaid that here an attorney-client relationship existed between appellant on the one hand and Powers and Smith on the other. *See* Mil.R.Evid. 502(a), (b)(1), and (b)(2), Manual for Courts-Martial, United States, 1969 (Revised edition); *United States v. Saenz,* 18 M.J. 327, 328 (C.M.A. 1984).

However, he testified that, because this was just "speculation" at the early stages of his representation, he did nothing more about the problem which loomed on the horizon. Given these circumstances, Captain Powers—and, subsequently, Captain Smith—would have been well-advised to have been more sensitive to this admonition in the ABA Standards, The Defense Function, Standard 4–3.5(b) (2d ed. 1979)[4]:

> The potential for conflict of interest in representing multiple defendants is so grave that *ordinarily a lawyer should decline to act for more than one of several co-defendants except in unusual situations when, after careful investigation, it is clear that:*
>
> (i) *no conflict is likely to develop*[5];
>
> (ii) the several defendants give an informed consent to such multiple representation; and
>
> (iii) the consent of the defendants is made a matter of judicial record.

(Emphasis added.)

█ Of course, the two attorneys missed this early opportunity to avoid a potential conflict of interest between appellant and Peelman. Thus, our concern focuses on the propriety of Captain Smith's discussing testimonial immunity for Peelman with Major Torres while Smith still represented appellant and of Captain Smith's subsequent advice to Peelman concerning cooperation under the anticipated grant of immunity.

It is clear that, whatever was the precise nature of the conversations, discussion took place between Captain Smith and Major Torres—while the former still represented appellant—about the possibility of testimonial immunity for Peelman. It was at this point that a conflict of interest moved from "speculation," as Captain Powers had labeled it, to hard reality.

The Government has sought to downplay these exchanges by characterizing the immunity not as a matter of negotiation but rather as a *"fait accompli."* This contention overlooks the realities of the criminal-justice process. We are aware that often the best defense that can be provided for a person accused of a crime is to offer to assist investigators and prosecutors in return for leniency in some form—such as dismissal of charges, and reduction or suspension of sentence. The extent of leniency that can be obtained often varies in proportion to the extent of information being provided and the prominence of the person who is the subject of that information.

Sometimes an accused may be reluctant to obtain personal benefit in this manner; and his attorney may need to explore with him very candidly the gains and losses that would result from his cooperating with law-enforcement officials. Sometimes the overall results may be better if an accused does not seek leniency and encourages fellow accused to contest charges. Moreover, the time of negotiations for immunity or leniency in return for cooperation may be important.

In light of the important role of an attorney in advising his client as to cooperation with prosecutors and in negotiating for such benefits as transactional versus testimonial immunity, or a reduced sentence, we cannot gloss over Smith's role as Peelman's legal advisor. If he performed that role in a professional manner, his performance almost inevitably compromised his role as Newak's legal advisor. Conversely, if he acted effectively for Newak, he could not have performed suitably for Peelman.

---

4. Paragraph 1–11 of Air Force Manual 111–1 (Military Justice Guide) (C. 2, October 1976) states:

> As far as practicable, and when not inconsistent with the Uniform Code of Military Justice, Manual for Courts-Martial, 1969 (Rev.), and departmental directives, the American Bar Association Standards for Criminal Justice are applicable to courts-martial.

Thus, arguably, failure to adhere to this standard violates Air Force regulations and, in the process, denies an accused military due process of law. *Cf. United States v. McGraner,* 13 M.J. 408, 415 (C.M.A. 1982); *United States v. Dunks,* 1 M.J. 254 (C.M.A. 1976).

5. "[C]areful investigation" in this case should have caused just the opposite conclusion. *See* n. 2, *supra.*

For example, it might have injured Peelman if Smith had proposed that, in return for acceptance of a resignation in lieu of court-martial, Newak would testify about misconduct of Peelman or others. Likewise, even if maintaining a united front of silence might have benefited Newak, Smith might well have concluded that for him to urge such a course of action would damage Peelman's chance to obtain dismissal of charges in return for offering information about appellant. In short, because Captain Smith was not free to argue against Peelman's interest, he was not free to represent Newak adequately.

By way of analogy to conflicts arising in the context of plea negotiations, we note the following portion of the Commentary to Standard 4–3.5, *supra* at p. 4.42:

> Frequently, however, the differences or conflicts are more subtle but still make effective, zealous representation of all defendants impossible. During the plea negotiation stage, for example, a lawyer cannot urge identically favorable plea agreements for all of the defendants unless all are identically situated. The presence of even slight differences in the backgrounds of defendants or in their cases (*e.g.,* one defendant held a gun while the other served as a lookout) means that strong advocacy to the prosecutor on behalf of one codefendant necessarily undermines, by comparison, the position of other defendants.

Much the same might well be said of the position in which Captain Smith found himself here via-a-vis the matter of immunity. Under such circumstances, Captain Smith's passivity amounted to nothing less than abandonment of appellant. *See United States v. Davis*, 3 M.J. 430 (C.M.A. 1977).

Unfortunately, Captain Smith's sacrifice of appellant's interests did not end with this sin of omission but extended, as well, to subsequent sins of commission. After he had severed his relationship with appellant, he continued to represent Peelman in this matter and actively to advise her and encourage her to act in her own self-interest. Sadly for Smith—and for appellant—

it is clear that those interests were not parallel to appellant's; indeed, they ran to a point of inevitable confrontation. Under these circumstances, Captain Smith aided the successful prosecution of his former client just as surely as if he had sat at the trial counsel's table—and just as surely, this was improper. *See generally* Art. 27(a), UCMJ, 10 U.S.C. § 827(a) ("nor may any person who has acted for the defense act later in the same case for the prosecution"); *accord United States v. Stubbs*, 23 M.J. 188 (C.M.A. 1987).

Even more in point, Captain Smith frankly admitted to the military judge that his advice and counsel to Peelman were affected by the confidences with which appellant had entrusted him as her attorney. Surely, this was improper. Smith's duty to safeguard appellant's confidences continued beyond severance of their relationship. *See* ABA Model Rules of Professional Conduct, Rule 1.6, Comment, *"Former Client"* (1983). Rule 1.9 of these Model Rules leaves no doubt as to the impropriety of Smith's action in this regard:

> A lawyer who has formerly represented a client in a matter shall not thereafter:
>
> (a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or
>
> (b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known.

The Comment to this rule states in part: "Information acquired by the lawyer in the course of representing a client may not subsequently be used by the lawyer to the disadvantage of the client." *See also* Rule 1.7 of these Model Rules.

## IV

As we noted earlier, the Court of Military Review found saving solace in the fact

that the conflict here was caught "early in the proceedings," so that Captain Smith did not represent appellant either at the investigation under Article 32, UCMJ, 10 U.S.C. § 832, or at trial. *United States v. Newak, supra* at 543. Implicitly, what the lower court concluded was that, because "conflict-free" counsel represented appellant at all critical stages and, therefore, because she received effective assistance of counsel in her defense, appellant was not prejudiced by these legal and ethical transgressions by her earlier attorneys. *See United States v. Wattenbarger*, 21 M.J. 41, 46 (C.M.A. 1985), *cert. denied*, — U.S. —, 106 S.Ct. 3272, 91 L.Ed.2d 563 (1986).

This analysis, however, turns a blind eye to the visible continuing ramifications throughout the proceedings of Captain Smith's compromise of appellant's interests. A fair reading of the record leaves no doubt in our minds that, at a minimum, Captain Smith played an important role in producing the testimony of Airman Peelman—testimony which, as to several charges, constituted the only evidence or the principal evidence against appellant.[6] In this light, the skill and competence of appellant's subsequent counsel could not possibly have overcome the damage done by her earlier counsel; to say that appellant was not prejudiced would be to indulge in totally unfounded speculation.

■ Under the circumstances, the testimony of Peelman and any evidence or information derived therefrom was tainted and should not have been admitted in evidence at the trial. Accordingly, the findings of guilty as to Charge II and its specification; specification 3 of Charge III; and the Additional Charge and its specifications, as well as the sentence, cannot stand.

Without this evidence, it seems unlikely that the Government can prove these charges at a rehearing; but, if alternative untainted evidence is available, we shall allow a rehearing on those charges.

We also are concerned that some "spillover" may have occurred from the findings that were directly tainted to the other findings of guilty. *Cf. United States v. Hogan*, 20 M.J. 71 (C.M.A. 1985). This issue has not been considered by the Court of Military Review; and we believe that they should have an opportunity to consider it upon remand.

## V

The decision of the United States Air Force Court of Military Review is reversed as to Charge II and its specification; specification 3 of Charge III; and the Additional Charge and its specifications, as well as the sentence. The findings of guilty on those charges and specifications and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Air Force for remand to that court for consideration of the issue of whether the remaining findings of guilty were tainted by the actions of defense counsel. If they were, a rehearing may be ordered on all charges and specifications which were approved by the convening authority. If they were not tainted, a rehearing may be ordered on the specifications and Charges affected by the decision of this Court and the sentence. If a rehearing on findings is deemed impracticable, the affected Charges and specifications may be dismissed. If any specifications remain, a rehearing on sentence may be ordered.

Judge SULLIVAN did not participate.

COX, Judge (concurring in the result):

I agree with Chief Judge Everett to the extent that Airman Peelman's testimony *at this trial* was so tainted that appellant's conviction of the affected specifications cannot stand, and I agree that the testimony is permanently tainted. I would not preclude the Government from retrying the case with a view towards eliciting new un-

---

6. The findings which we will set aside are those in which Peelman's testimony constituted either the only evidence of appellant's guilt or such

strong evidence that we are unable to conclude that appellant was not prejudiced from Peelman's testimony thereon.

tainted testimony from her during a new trial.

As I read the record of trial, it appears that the military judge was satisfied that no *communication* from appellant was ever transmitted through Smith to Peelman. If so, there is no reason why Peelman should not now be permitted to testify as to matters of which she has, at all times, had personal knowledge, providing she is willing to testify without immunity. Indeed, if Peelman knew anything about appellant's litigation posture, the record suggests that it was gained directly from appellant herself during their frequent exchanges of information, often immediately following their respective sessions with counsel.

In view of the questions surrounding the involvement of defense counsel and the circumstances of Peelman's testimony, however, I would agree, out of an abundance of caution, that the Government at a rehearing should again establish, by a preponderance of the evidence, that any testimony sought to be introduced was not affected by an improper communication from Smith to Peelman.

Accordingly, I concur in the disposition of the present case decreed by Chief Judge Everett in his opinion.