UNITED STATES

v.

**Second Lieutenant Joann C. NEWAK, 167–38–0452 FV United States Air Force.**

ACM 23544.

U. S. Air Force Court of Military Review.

Argued 15 Oct. 1982.

Decided 14 Dec. 1982.

Appellate Counsel for the Accused: Ms. Faith A. Seidenberg, Syracuse, New York.

Appellate Counsel for the United States: Colonel Kenneth R. Rengert and Captain Brenda J. Hollis.

Before HODGSON, HEMINGWAY and MILLER, Appellate Military Judges.

## DECISION

HODGSON, Chief Judge:

Tried by general court-martial with the military judge sitting alone, the accused was convicted, despite her pleas, of wrongfully using, possessing and transferring marijuana, attempting to wrongfully possess and transfer a substance she believed to be amphetamines; sodomy, and conduct unbecoming an officer, in violation of Articles 80, 125, 133 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 880, 925, 933, 934. The approved sentence extends to a dismissal, forfeiture of all pay and allow-

ances, and confinement at hard labor for six years.

## I

At the outset, we are faced with the assertion that the accused was deprived of effective assistance of counsel under the Sixth Amendment because her assigned military defense counsel, Captain S, worked against her interests. The record disclosed that the Area Defense Counsel (ADC) assigned to Griffiss Air Force Base, New York, also provides defense services[1] to Hancock Field, New York, where the accused is assigned and where her trial took place. In the summer of 1981, Captain P was the ADC at Griffiss AFB and was appointed to represent the accused and Senior Airman Peelman, who were being investigated for alleged homosexual activities. During this same period Captain P was notified of his reassignment that fall, and told that Captain S, who was assigned to the Griffiss AFB legal office, was to be his replacement.

To insure an orderly changeover, Captain P took Captain S to Hancock Field and introduced him to the accused and later, in a separate interview, to Peelman. Captain P indicated to both individuals that he was leaving and that Captain S would be the new ADC. Captain P then discussed various aspects of each case with the parties concerned, with Captain S present; these interviews occurred in early September and were conducted at the Hancock Field legal office. At this time Captain S was still assigned to Griffiss AFB.

On approximately 20 October, Captain S became aware that his representation of both the accused and Peelman might result in a conflict of interest as the result of the government giving Peelman a grant of immunity.[2] The subject was broached to him by the Staff Judge Advocate, Hancock Field. Upon learning of the grant, Captains P and S called the Chief Circuit De-

fense Counsel whose responsibility is the professional supervision of all Area Defense Counsel within the circuit. *See United States v. Cahill,* 3 M.J. 1030 (N.C.M.R.1977). The situation was outlined to him and he concluded that Captain S could not represent the accused; accordingly, a different ADC was appointed as her counsel. This attorney assisted in her defense at both the pretrial investigation and the trial itself; the accused also retained a civilian attorney as lead counsel. Captain S continued as counsel for Peelman. Subsequently, he also represented Airman Liles. Both Liles and Peelman testified against the accused under grants of immunity. Captain S admitted telling Liles and Peelman "to stay away from Newak because she's going down the tubes."

■ The rule that an attorney cannot represent conflicting interests is one that courts strictly enforce. *United States v. Melton,* 30 C.M.R. 796 (A.F.B.R.1960). Here, however, we note that the conflicting interests were identified early in the proceedings and a new attorney was appointed for the accused *before* charges were preferred. *See People v. Davis,* 210 Cal.App.2d 721, 26 Cal.Rptr. 903 (1962). We find it significant that Captain S did not represent the accused at either the pretrial investigation or at the trial itself. *Cf. United States v. Davis,* 3 M.J. 430 (C.M.A.1977) (defense counsel cross-examined a former client at trial).

■ Prior representation by defense counsel of a government witness against the accused does not by itself justify a conclusion that the accused was denied effective representation, particularly when that defense counsel does not represent the accused at trial. *United States v. Lovett,* 7 U.S.C.M.A. 704, 23 C.M.R. 168 (1957); *United States v. Peebles,* 2 M.J. 404 (A.C.M.R. 1975). It must also be shown that the accused was harmed by the relationship.

---

1. A full description of his duties is contained in Air Force Manual 111–1, Military Justice Guide, para. 13–2, 2 July 1973, Change 4 (13 May 1980).

2. On 17 November 1981, Peelman was given a grant of immunity by the Commander, 9th Air Force.

*United States v. Thornton*, 8 U.S.C.M.A. 57, 23 (C.M.R. 1957).

■ The accused seeks to establish this harm by showing that Captain S was assigned to the Griffiss legal office at the time he entered into an attorney-client relationship with her. This, in her view, is sufficient to prove prejudice as it suggests that her assigned counsel had divided loyalties. We do not attach the same importance to this as does appellate defense counsel. The Griffiss legal office and the Hancock legal office are separate organizations in different chains of command.[3] Griffiss legal office has absolutely no control over trials convened at Hancock Field. Thus, that Captain S was ostensibly still assigned to the Griffiss office when he spoke with the accused could not have influenced a trial at Hancock Field in any way.

Next, appellate counsel argues that the subsequent representation by Captain S of Peelman and Liles, who testified against the accused, shows that S had abandoned her while still her counsel. Finally, appellate counsel finds fault in the fact that both Captains S and P used the Hancock Field legal office to interview potential witnesses. This, she contends, is an unjustified casual approach to the confidentiality of the attorney-client relationship and indicative of the quality of the representation the accused received prior to charges being preferred. Both military counsel stated that this was done as a matter of convenience since Hancock Field had no ADC office.

These circumstances, in our opinion do not amount to ineffective representation. The accused was given different counsel when it became apparent that she, Peelman and Liles could not all be represented by Captain S. Again we note that this was accomplished early in the proceedings prior to the charges being preferred. We agree that Captain S was less than discreet when he later suggested that Peelman and Liles avoid the company of the accused "as she was going down the tubes," but it is not contended that he induced them to testify

falsely or divulged to them information given him in confidence by the accused. In short, we find the accused has suffered no prejudice. We conclude that Captain S adequately protected the confidences given him by the accused, and she was not denied effective assistance of counsel. *Accord United States v. Barrois*, 47 C.M.R. 169 (A.C.M.R.1973), *see also United States v. Brooks*, 2 M.J. 102 (C.M.A.1977).

## II

■ The accused next contends that her conviction of attempting to wrongfully possess and transfer amphetamines cannot stand as the substance was in fact "over the counter" diet pills. (Specification 3 of Charge I and Specification of Charge II). Therefore, according to her, the crime charged is legally impossible. We disagree. To constitute an attempt to commit a crime there must be an intent to commit the crime, an overt act toward its commission, and its consummation must be apparently possible. Manual for Courts-Martial, United States, 1969 (Rev.), para. 159. The question of whether the accused attempted to possess or transfer an illicit drug does not depend upon the true nature of the substance involved. *United States v. Dominguez*, 7 U.S.C.M.A. 485, 22 C.M.R. 275 (1957). Here the record establishes that the accused thought the substance was amphetamine and therefore the commission of the offense was apparently possible. *United States v. Foster*, 14 M.J. 246 (C.M.A.1982). *See generally, United States v. Bruce*, 14 M.J. 254 (C.M.A.1982).

## III

■ Finally, appellate counsel urges that the sentence was excessive and that confinement of any duration would be inappropriate. We cannot ignore that the accused, an officer, encouraged the use of marijuana and other illicit drugs among Air Force personnel, and committed numerous acts of sodomy with a female enlisted person.

---

**3.** Griffiss Air Force Base is assigned to 8th Air Force, Strategic Air Command, while Hancock Field is assigned to 9th Air Force, Tactical Air Command.

Upon consideration of the total record, we find the sentence entirely appropriate.

We have considered the remaining assigned error and have resolved it adversely to the accused. Accordingly, the findings of guilty and the sentence are

AFFIRMED.

HEMINGWAY, Senior Judge (concurring):

During oral argument, counsel for the accused urged a reduction in the sentence because the accused's crimes were committed off duty, off base and would not have been punished as severely in a civilian community. This argument fails to recognize "that the military is, by necessity, a specialized society separate from civilian society." *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). This difference is due to the mission of the military to maintain the ability to fight when our national leadership determines it necessary to preserve our security. This mission requires discipline and obedience. Commissioned officers have a special responsibility to conduct themselves in a manner that promotes discipline, obedience and respect. That responsibility cannot be checked at the gate on the way home at the end of the duty day. Officers who fail to meet that responsibility by engaging in criminal conduct in the presence of subordinates violate their oath of office and strike at the heart of the military code of behavior. As a result, I view the accused's sentence as appropriate.

MILLER, Judge (concurring):

I fully concur with the opinions of both my chief and senior judge. I nevertheless remain concerned that neither opinion seriously responds to two innuendos contained in defense assignment of error 4; to wit: (1) that "non-military" type offenses, even though criminalized by the Uniform Code of Military Justice, should not be subject to trial by court-martial if committed within civilian jurisdictional boundaries in which the prohibited activities are not criminal offenses, and, (2) that courts-martial should be restricted to the sentencing considerations of civilian court jurisdictions in which they sit.

In essence, these innuendos implicitly attack the Constitution's division between military and civilian justice systems. If military personnel cannot be subjected to punishment for misconduct unless that misconduct amounts to a crime in the civilian court jurisdiction where it is committed—and if courts-martial must, in fact, adhere to the identical sentencing considerations of civilian courts within geographic jurisdictions where offenses are committed—the duplication of resources required by the division cannot be economically justified.

Although, such an attack on the Constitution's division between military and civilian justice system's is not unique, similar attacks in the past have generated little positive research into the area. As in the lead opinion of this case, continuing justification for division of the systems has been accepted almost as a matter of faith. While the words "exigencies of the service" or "Article I as opposed to Article III courts" have occasionally been uttered, not a single military opinion or article that has discussed current and past justifications for the constitutional division between military and civilian justice systems in a serious and indepth manner. The following opinion, represents my attempt to fill this void.

In the discussion that follows, I: (A) set forth the two axioms which appear to have always underlaid this nation's perceived need for the separation of military and civilian justice systems; (B) look to the reasons why our founding fathers felt it necessary to incorporate these axioms into our Constitution; and, (C) review the history of the constitutional division between the justice systems, via discussions of Supreme Court cases that have dealt with them. I conclude that a division between our military and civilian justice systems remains as essential today, as it was when the Constitution was first written. Without it, it remains impossible to assure an effective armed force that will forever be completely responsive to our central civilian government.

## A

The first axiom I set forth is that since the beginning of time, any comparatively wealthy nation has had to maintain an effective fighting force, lest its less fortunate or greedier neighbors be encouraged to forcefully redistribute such a nation's wealth on a more even or equitable geographic basis. Contrary to the hopes of generations of philosophers, neither moral nor technological progress has eroded the basic hypotheses underlying this axiom. Indeed, in view of (1) the inverse correlation between wealth and birth rates of nations, (2) the technologically produced "shrinkage" of distances between nations, and (3) the awesome power of modern nuclear weapons that are now capable of being produced by virtually any nation obtaining a small amount of certain materials, today, effective fighting forces are more critical to wealthy nations than ever before.

The second axiom is simply that a fighting force cannot be effective absent unquestioning obedience to superior orders on the part of its soldiers. Indeed, assuming competent leadership, the only thing that has ever separated an unruly armed mob from an efficient armed force has been the degree by which individual members of any particularly armed group respond or fail to respond to the commands of that group's necessarily hierarchical leadership. In fact, as noted by Justice Blackmun, history's only recorded attempt to democratize a national armed force resulted in abject failure:

> One need only read the history of the permissive—short lived—regime of the Soviet Army in the early days of the Russian Revolution to know that command indulgence of an undisciplined rank and file can decimate a fighting force.

Parker v. Levy, 417 U.S. 733, 763, 94 S.Ct. 2547, 2565, 41 L.Ed.2d 439, 462 (1974) (Blackmun, with whom The Chief Justice joins, concurring). See generally B. Tuchman, Guns of August (1962).

Evidence of mankind's recognition of these two historic axioms extends back to legionary tribunes that ancient Rome created to provide a separate system of justice for its armed forces long before the birth of Christ. See, Winthrop, Military Law and Precedents (2d ed. 1920), at 45. Most certainly, their intrinsic truths were not lost upon the founders of this nation.

## B

When our founding fathers decided to attempt to throw off the bonds of authoritarian rule, they attended to first priorities by penning The Massachusetts Articles of War, a full year before they took the time necessary to create and sign the Declaration of Independence.

> ... And whereas we are frequently told by the tools of the administration, dupes to Ministerial usurpation, that Great Britain will not in any degree relax in her measures until we acknowledge her "right of making laws binding upon us in all cases whatsoever," and that if we persist in our denial of her claim, the dispute must be decided by Arms, in which it is said by our enemies "we shall have no chance, being undisciplined, cowards, disobedient, impatient of command, and possessed of that spirit of reveling which admits of no order, subordination, rule, or government."
>
> And whereas the Ministerial Army and Fleet now at Boston, the large reinforcement of Troops expected, the late Circular Letter to the Governours, upon the Continent, the general tenour of intelligence from Great Britain and the hostile preparations making here, as also from the threats and repeated insults of our enemies in the Capital Town, we have reason to apprehend that the sudden destruction of this Province is in contemplation if not determined upon.
>
> And whereas *the great law of self-preservation may suddenly require our raising and keeping an Army of observation and defence,* in order to prevent or repel any further attempt to force the late cruel and oppressive Acts of the British Parliament, which are evidently designed to subject us and the whole Continent to the most ignominious slavery. And whereas, *in case of raising and keeping*

*such an Army it will be necessary that the Officers and Soldiers in the same be fully acquainted with their duty, and that the Articles, Rules and Regulations thereof be made as plain as possible;* and having great confidence in the honour and public virtue of the inhabitants of this Colony that they will readily obey the Officers chosen by themselves, and will cheerfully do their duty when known without any such severe Articles and Rules, (except in capital cases,) and cruel punishments as are usually practised in Standing Armies, and will submit to all such Rules and Regulations as are founded in reason, honour and virtue. [While the Articles, Rules and Regulations do in many cases provide that a violator may be punished as a court-martial may direct, the 50th Article specifically prohibits a court-martial from sentencing a violator to be whipped or to receive more than thirty-nine stripes per offense.] It is, therefore,

RESOLVED, That *the following Articles, Rules and Regulations for the Army that may be raised for the defence and security of our lives, liberties, and estates, be and are hereby earnestly recommended to be, strictly adhered to, by all Officers, Soldiers, and others concerned, as they regard their own honour and the publick good.* [Emphasis added.]

The Massachusetts Articles of War, April 5, 1775, in Winthrop, *supra,* at 947.

Exactly 10 weeks after the provisional Congress of Massachusetts Bay adopted these Articles, the second Continental Congress, also recognizing the intrinsic truths of these two historical axioms, "resolved" that a military force should "be immediately raised" to "march and join the army near Boston." Based upon the recommendations of its committee on spies, consisting of George Washington, Phillip Schuyler, Silas Deane, Thomas Cushing, and Joseph Hewes, the Continental Congress, on 30 June 1775, adopted the American Articles of War, substantially patterned after the already existent Massachusetts Articles of War. Winthrop, *supra,* at 21–22.

Nor was the necessity of a well-regulated militia lost upon the representatives of the Virginia Convention when its members, on 12 June 1776, gathered to sign the Virginia Bill of Rights. In a historically unique effort not only to provide for an effective fighting force, but to insure that this force's internal discipline would forever subordinate its potentially oppressive activities to the control of an elected civilian government, the thirteenth paragraph of this sixteen paragraph document stated:

That a well-regulated militia, composed of the body of the people trained to arms, is the proper, natural and safe defence of a free state; that standing armies in time of peace should be avoided as dangerous to liberty; and that in all cases the military should be under strict subordination to and governed by the civil power.

Virginia Bill of Rights, 12 June 1776, in Am.Jur.2d Desk Book, Item No. 185.

Certainly the Virginians were not alone in their fear of an undisciplined, uncontrollable standing army. George Washington, a member of the committee on spies which had originally recommended that the American Articles of War be adopted by the Continental Congress, obviously spoke for a number of new Americans, when, concerned about protecting the civilian citizenry of the new nation from potential abuses of its standing army, he wrote:

"All improper treatment of an inhabitant by an officer or soldier being destructive of good order and discipline as well as subversive of the rights of society is as much a breach of military, as civil law and as punishable by the one as the other."

14 Writings of George Washington 140–141 (Bicent. ed.). *Cited in O'Callahan v. Parker,* 395 U.S. 258, at 281–282, 89 S.Ct. 1683, at 1695, 23 L.Ed.2d 291, at 307 (1969) (Justice Harlan, whom Justice Stewart and Justice White join, dissenting).

At the same time, however, the writings of Alexander Hamilton, revealed another concern of the founding fathers. The rules and regulations attendant to the governing of the new nation's standing army had to remain flexible:

Because it is impossible to foresee or define the extent and variety of national exigencies, [that such an army might be asked to respond to] or the corresponding extent & variety of the means which may be necessary to satisfy them.

The Federalist No. 23. *Cited in O'Callahan v. Parker, supra,* at 277, at 1693, at 305 (1969) (Justice Harlan, whom Justice Stewart and Justice White join, dissenting).

The seemingly irreconcilable problem these two concerns presented to the colonists, was aptly described by Justice Black in *Reid v. Covert,* 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957):

> The tradition of keeping the military subordinate to civilian authority may not be so strong in the minds of this generation as it was in the minds of those who wrote the Constitution... The Founders envisioned the army as a necessary institution, but one dangerous to liberty if not confined within its essential bounds. Their fears were rooted in history. They knew that ancient republics had been overthrown by their military leaders.

*Id.,* at 23, at 1234, at 1167 (1957).

Just 20 days before the General Congress of the United States of America signed the Declaration of Independence, its members, once again, displayed their continuing concern about this issue by resolving that a committee consisting of John Adams, Thomas Jefferson, John Rutledge, James Wilson and R.R. Livingston "be directed to revise the rules and articles of war." But, alas, the resultant American Articles of War, enacted on 20 September 1776, were, again, largely based upon the original Massachusetts Articles, albeit, somewhat enlarged and modified. Winthrop, *supra,* at 22.

Happily, when the Constitutional Convention convened after the Revolutionary War, the issue was resolved. In a unique and bold scheme designed specifically to assure that the armed force of their new nation would forever remain, both combat effective *and* completely responsive to an immediate and flexible control by the central government, the ingenious framers of the Constitution placed responsibility for establishing a separate Government for the Armed Forces in the Legislature, while placing its operational control in the President. By so doing, they provided: first, a prompt but reasoned method of changing the government of the armed forces should some unforeseen exigency require such a change (simple enactment of a law rather than a complex change to the Constitution); and second, immediate and total control in the President of both the operations of the armed force and, hierarchically, the actions of every individual in it within the framework of its then existing system of government.

As Justice Harlan has described it, the delegates simply sophisticated a solution already contained, in part, in the Articles of Confederation:

> The burden of English history was not lost on the Framers of our Constitution, who doubtless feared the Executive's assertion of an independent military authority unchecked by the people acting through the Legislature. Article 9, sec. 4, of the Articles of Confederation—from which Art. I, sec. 8 cl. 14, of the Constitution was taken—was responsive to this apprehension:
>
> > "The United States in Congress assembled shall ... have the *sole and exclusive* right and power of ... making rules for the government and regulation of the ... land and naval forces, and directing their operations. (Emphasis added.)"

*O'Callahan v. Parker, supra,* at 277, at 1693, at 304–305 (1969) (Justice Harlan, whom Justice Stewart and Justice White join, dissenting).

Having accomplished this, the task of the Convention's delegates in establishing a document that would "form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty," Preamble, U.S. Const., was greatly simplified. Because only a few sentences, essentially Art. I, sec. 8, cls. 12–14 and Art. II, sec. 2, cl. 1, were required to incorporate these concepts

into the Constitution, and because the delegates were confident that the present system of military government, already established and proven during the revolution, provided Congress with an adequate starting point from which to fulfill its new military responsibilities, the delegates were free to concentrate upon creating a new system of civilian government of, by, and for the people.

Even though they had created a new constitution that provided for the government of both the new nation's civilian and military populations, albeit by distinctly separate rules, the delegates, particularly from the Virginia delegation, nevertheless remained concerned with the freedoms they had sought to guarantee to the civilian population. Hence, before ratification of the document could be accomplished, a Bill of Rights affording additional protections, at least to the civilian population, was added to the original document in the form of ten separate amendments.

Today we are told by Constitutional scholars that it is unclear whether the guarantees of freedom enumerated in the Constitution's first ten amendments (which appear in many ways to have been originally intended to protect civilians from potential abuses by military personnel [1]) were limited exclusively to the civilian population or intended to encompass personnel of the regular army.[2] At any rate, the First Congress in 1789, did, in fact, leave the Articles of War intact exactly as they had been since long before the time of the Constitution's ratification.

### C

My extensive survey of Supreme Court decisions relating to this constitutional division of government and, consequentially, justice systems for the military and civilian segments of our society, demonstrates that the same fundamental axioms that were originally the basis for its creation, have remained seriously unchallenged, throughout this nation's ensuing history.

The two earliest cases I uncovered naturally, dealt with the authority of the national government over individual members of, then, still active state militias, who were serving in, or about to serve in, the national army. Although, the specific rulings of these cases have little pertinence to today's problems in the military, portions of each case's dicta offer revealing glimpses of the early Supreme Court view on the constitutional separation of military and civilian justice systems.

> [A]t the first session of Congress which commenced after the adoption of the constitution, the judicial system was formed.... In particular, this law grants exclusive jurisdiction to the circuit courts of all crimes and offenses cognizable under the authority of the United States, except where the laws of the United States should otherwise provide....
>
> \*     \*     \*     \*     \*     \*
>
> But military offenses are not included in the act of Congress, conferring jurisdiction upon the circuit and district courts: no person has ever contended that such offenses are cognizable before the common law courts.

*Houston v. Moore,* 18 U.S. 1, at 26, 27 (5 Wheat. 1, at 26, 27), 5 L.Ed. 19, at 25, 25 (1820) (Justice Washington).

> The offense [is an offense] ... against the United States, created by a law of Congress, in virtue of a constitutional authority, and punishable by a tribunal which it has selected, and which it can change at its pleasure.
>
> That tribunal is a court-martial...

*Id.,* at 65–66 (65–66), at 35 (Justice Jackson).

---

1. Read the language of the Second, Third, Fourth, Fifth, and Sixth Amendments to the Constitution, recognizing the fears concerning the existence of a standing army that existed during our nation's formative years.

2. For conflicting views on this matter, see G. Henderson, *Courts-Martial and the Constitution: The Original Understanding,* 71 Harvard L.Rev. 293 (1957) and F. Weiner, *Courts-Martial and the Bill of Rights: The Original Practice,* 72 Harvard L.Rev. 1 (1958).

Seven years after *Houston v. Moore* implicitly recognized that the military's justice system fell exclusively within the control of Congress, to the exclusion of the judiciary, Justice Story, in *Martin v. Mott,* 25 U.S. 19 (12 Wheat. 19), 6 L.Ed. 537 (1827) recognized, for the first time, the import of "usage and custom" in the military's justice system. Addressing the lack of express authority for formation of courts-martial to try members of the state militia "employed in the service of the United States," he wrote:

> If, then, there be no mode pointed out for the formation of the court-martial in these cases, it may be asked, in what manner is such court to be appointed? The answer is, according to the general usage of the military service, or what may not unfittingly be called the customary military law. It is by the same law that courts-martial, when duly organized, are bound to execute their duties, and regulate their modes of proceeding, in the absence of positive enactments. Upon any other principle, courts-martial would be left without any adequate means to exercise the authority confided to them; for there could scarely be framed a positive code to provide for the infinite variety of incidents applicable to them.

*Id.,* at 35–36, (35–36), at 542. *Cited in Parker v. Levy, supra,* at 745, at 2556, at 451 (1974) (Justice Rehnquist, Opinion of the Court).

The first case to directly rule that the military's justice system is governed and controlled by Articles I and II of the Constitution, while the civilian justice system is ruled by Article III, was *Dynes v. Hoover,* 61 U.S. 65 (20 How. 65), 15 L.Ed. 838 (1858).

> Among the powers conferred upon Congress by the 8th section of the 1st article of the Constitution, are the following "to provide and maintain a navy;" "to make rules for the government of the land and naval forces." And the 8th [sic.] amendment, which requires a presentment of a grand jury in cases of capital or otherwise infamous crime, expressly excepts from its operation "cases arising in the land or naval forces." And by the 2d

section of the 2d article of the Constitution it is declared that "The President shall be Commander-in-Chief of the Army and Navy of the United States, and of the militia of the several States when called into the actual service of the United States."

> These provisions show that Congress has the power to provide for the trial and punishment of military and naval offenses in the manner then and now practiced by civilized nations; and that the power to do so is given without any connection between it and the 3d article of the Constitution defining the judicial power of the United States; indeed, that the two powers are entirely independent of each other.

*Id.,* at 78–79 (78–79), at 843. *See Reid v. Covert,* 354 U.S. 1, at 19, 77 S.Ct. 1222, at 1231–1232, 1 L.Ed.2d 1148, at 1164–1165 (1957); *O'Callahan v. Parker, supra,* at 261–262, at 1685, at 295–296 (1969) (Justice Douglas, Opinion of the Court); *Id.,* at 277, at 1693, at 304–305 (1969) (Justice Harlan, whom Justice Stewart and Justice White join, dissenting); *Relford v. Commandant,* 401 U.S. 355, at 367, 91 S.Ct. 649, at 656, 28 L.Ed.2d 102, at 110 (1971); *Schlesinger v. Ballard,* 419 U.S. 498, at 510, 95 S.Ct. 572, at 578, 42 L.Ed.2d 610, at 619 (1975); *Rostker v. Goldberg,* 453 U.S. 57, at 71, 101 S.Ct. 2646, at 2654, 69 L.Ed.2d 478, at 490 (1980).

After, again, reemphasizing the Court's position in *Houston v. Moore* and *Martin v. Mott:*

> Courts-martial derive their jurisdiction and are regulated with us, by an Act of Congress, in which the crimes which may be committed, the manner of charging the accused, and of trial, and the punishments which may be inflicted, are either expressed in terms, or they may get jurisdiction by a fair deduction from the definition of the crime that it comprehends, and that the Legislature meant to subject to punishment one of a minor degree of a kindred character, which has already been recognized to be such by the practice of courts-martial in the army and navy services of nations, and by those

functionaries in different nations to whom has been confided a revising power over the sentences of courts-martial.

*Dynes v. Hoover,* supra, at 82 (at 82), 844–845; Justice Wayne, went on to elaborate upon *Martin v. Mott*'s concept of "the customary military law":

> And when offenses and crimes are not given in terms or by definition, the want of it may be supplied by a comprehensive enactment, such as the 32d article of the Rules for the Government of the Navy, which means that courts-martial have jurisdiction of such crimes as are not specified, but which have been recognized to be crimes and offenses by the usages in the navy of all nations, and that they shall be punished according to the laws and customs of the sea. Notwithstanding the apparent indeterminateness of such a provision, it is not liable to abuse; for what those crimes are, and how they are to be punished, is well known by practical men in the navy and army, and by those who have studied the law of courts-martial, and the offenses of which the different courts-martial have cognizance. With the sentences of courts-martial which have been convened regularly, and have proceeded legally, and by which punishments are directed, not forbidden by law, or which are according to the laws and customs of the sea, civil courts have nothing to do, nor are they in any way alterable by them.

*Dynes v. Hoover, supra,* at 82 (at 82), at 845. *Cited in Swaim v. United States,* 165 U.S. 553, at 555, 17 S.Ct. 448, at 449, 41 L.Ed. 823, at 823 (1897); *Parker v. Levy, supra,* at 747, at 2257, at 452–453 (1974) (Justice Rehnquist, Opinion of the Court).

Eight years later, in 1866, a decision was issued which nearly evenly divided the Court with respect to the authority of a military commission to try a civilian during time of rebellion, and, tangentially, caused the Justices to discuss whether or not they believed the Bill of Rights might be applicable to service personnel. Nevertheless, despite an apparent furor in chambers, the Court remained steadfast in its view that Congress possesses the Constitutional authority to legislate a separate system of justice for all citizens actually serving on active duty in the armed forces.

Speaking for the Court's five member majority, Justice Davis opined:

> The discipline necessary to the efficiency of the army and navy, required other and swifter modes of trial than are furnished by the common law courts; and, in pursuance of the power conferred by the Constitution, Congress has declared the kinds of trial and the manner in which they shall be conducted, for offenses committed while the party is in the military or naval service. Every one connected with these branches of public service is amenable to the jurisdiction which Congress has created for their government, and while thus serving, surrenders his right to be tried by civil courts.

*Ex Parte Milligan,* 71 U.S. 2, at 123 (4 Wal. 2, at 123), 18 L.Ed. 281, at 296 (1866) (Justice Wayne, Opinion of the Court).

Speaking for the four member minority, Chief Justice Chase, decidedly emphasizing his group's view on non-applicability of the Bill of Rights to service personnel, responded that:

> The Constitution itself provides for military government as well as for civil government.
>
>     *    *    *    *    *    *
>
> ... the power to make rules for the government of the army and navy is a power to provide for trial and punishment by military courts without a jury.
>
>     *    *    *    *    *    *
>
> The states, most jealous of the encroachments upon the liberties of the citizen, when proposing additional safeguards [to the Constitution] in the form of amendments, excluded specifically from their effect cases arising in the government of the land and naval forces. Thus Massachusetts proposed that "no person shall be tried for any crime by which he would incur an infamous punishment or loss of life until he be first indicted by a grand jury, except in such cases as may arise in

the government and regulation of the land forces." The exception in similar amendments, proposed by New York, Maryland, and Virginia, was in the same or equivalent terms. The amendments proposed by the states were considered by the first Congress, and such as were approved in substance were put in form, and proposed by that body to the states. Among those thus proposed and subsequently ratified was that which now stands as the fifth amendment of the Constitution.

*   *   *   *   *   *

We think, therefore, that the power of Congress in the government of the land and naval forces and of the militia, is not affected by the fifth or any other amendment.

*Id.,* at 137, 138 (137, 138), at 301, 301 (1866) (Chief Justice Chase [concurring and joined by three of his brethren]).

Whether in an effort to avoid additional *Ex Parte Milligan* type controversy over the possible applicability of the Bill of Rights to military personnel, or simply because the membership of the Court sincerely believed it was prohibited by the Constitution from interfering in the internal affairs of Article I military courts, the Court, during its next 87 years essentially decided every military case coming before it upon the single determinative issue in *Ex Parte Milligan;* to wit: is the person on trial properly subject to court-martial jurisdiction. *Ex Parte Reed,* 100 U.S. 13, 25 L.Ed. 538 (1879); *Keyes v. United States,* 109 U.S. 336, 3 S.Ct. 202, 27 L.Ed. 954 (1883); *Smith v. Whitney,* 116 U.S. 167, 6 S.Ct. 570, 29 L.Ed. 601 (1886); *United States v. Grimley,* 137 U.S. 147, 11 S.Ct. 54, 34 L.Ed. 636 (1890); *United States v. Fletcher,* 148 U.S. 84, 13 S.Ct. 552, 37 L.Ed. 378 (1893); *Johnson v. Sayre,* 158 U.S. 109, 15 S.Ct. 773, 39 L.Ed. 914 (1895); *Swaim v. United States, supra,* (1897); *Carter v. Roberts,* 177 U.S. 496, 20 S.Ct. 713, 44 L.Ed. 861 (1900); *In Re Vidal,* 179 U.S. 126, 21 S.Ct. 48, 45 L.Ed. 118 (1900); *Carter v. McClaughry,* 183 U.S. 365, 22 S.Ct. 181, 46 L.Ed. 236 (1902); *Reaves v. Ainsworth,* 219 U.S. 296, 31 S.Ct. 230, 55

L.Ed. 225 (1911); *Ex Parte Quirin,* 317 U.S. 1, 63 S.Ct. 2, 87 L.Ed. 3 (1942); *Gibson v. United States,* 329 U.S. 338, 67 S.Ct. 301, 91 L.Ed. 331 (1946); *Humphrey v. Smith,* 336 U.S. 695, 69 S.Ct. 830, 93 L.Ed. 986 (1949); *Hiatt v. Brown,* 339 U.S. 103, 70 S.Ct. 495, 94 L.Ed. 691 (1950); *Johnson v. Eisentrager,* 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950); *Whelchel v. McDonald,* 340 U.S. 122, 71 S.Ct. 146, 95 L.Ed. 141 (1950); *Orloff v. Willoughby,* 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953). *See also Wade v. Hunter,* 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949), which discussed, but did not answer, the potential applicability of the Fifth Amendment's double jeopardy clause to military tribunals.

The Court's opinions, nevertheless, continued to emphasize the predicates upon which the founding fathers had based their Constitutional separation of the two justice systems.

In *Smith v. Whitney, supra,* Justice Gray acknowledged that the logical conclusion stemming from the "customary military law" concept which the Court had introduced in *Dynes* and *Martin,* both, *supra,* is that Article III court judges are less competent than military officers, themselves, to judge matters relating to such unwritten military law or usage:

> Of questions, not depending upon the construction of the statutes, but upon unwritten military law or usage within the jurisdiction of courts-martial, military or naval officers, from their training and experience in the service, are more competent judges than the courts of common law.

*Smith v. Whitney, supra,* at 178, at 576, at 604 (1886). *Cited in, Swaim v. United States, supra,* at 562, at 451, at 826 (1897); *Parker v. Levy, supra,* at 748, at 2558, at 453 (1974) (Justice Rehnquist, Opinion of the Court).

Additionally in his decision, Justice Gray, for the first time, clearly enunciated the premise upon which 24 hour a day, on and off base, "status jurisdiction" of military personnel was to exist unchallenged for the next 83 years (*O'Callahan v. Parker, supra,* (1969)):

Under every system of military law for the government of either land or naval forces, the jurisdiction of courts-martial extends to the trial and punishments of acts of military or naval officers which tend to bring disgrace and reproach upon the service of which they are members, whether those acts are done in the performance of military duties, or in a civil position, or in a social relation, or in a private business.

*Smith v. Whitney, supra,* at 183–184, at 578–579, at 606 (1886). *Cited in Swaim v. United States, supra,* at 562, at 451, at 826 (1897); *O'Callahan v. Parker, supra,* at 282, at 1696, at 307 (1969) (Justice Harlan, whom Justice Stewart and Justice White join, dissenting).

Four years later, Justice Brewer elaborated on the rationale underlying *Smith v. Whitney's, supra,* "status jurisdiction" stating that:

By enlistment the citizen becomes a soldier. His relations to the state and the public are changed. He acquires a new *status,* with correlative rights and duties; and although he may violate his contract obligations, his *status* as a soldier is unchanged... While our regular army is small compared with those of European nations, yet its vigor and efficiency are equally important. An army is not a deliberative body. It is the executive arm. Its law is that of obedience. No question can be left open as to the right to command in the officer, or the duty of obedience in the soldier. Vigor and efficiency on the part of the officer, and confidence among the soldiers in one another, are impaired if any question be left open as to their attitude to each other. So, unless there be in the nature of things some inherent vice in the existence of the relation, or natural wrong in the manner in which it was established, public policy requires that it should not be disturbed.

*United States v. Grimley, supra,* at 152–153, at 55, at 638–639 (1890). *Cited in Parker v. Levy,* at 743, 748, at 2556, 2559, at 450, 455 (1974) (Justice Rehnquist, Opinion of the Court).

In 1897, Justice Shiras, settled the issue of the military justice system's status jurisdiction over "offenses to the prejudice of good order and military discipline" (then defined by Article of War 62):

It is strongly urged that no offense under the 62d article of war was shown by the facts, and that the court of claims should have so found and have held the sentence void. If this position were well taken it would throw upon the civil courts the duty of considering all the evidence adduced before the courts-martial and of determining whether the accused was guilty of conduct to the prejudice of good order and military discipline in violation of the articles of war.

But, as the authorities heretofore cited show, this is the very matter that falls within the province of courts-martial, and in respect to which their conclusions cannot be controlled or reviewed by the civil courts.

*Swaim v. United States, supra,* at 561–562, at 451, at 826, (1897). *Cited in Parker v. Levy, supra,* at 748, at 2558, at 453 (1974) (Justice Rehnquist, Opinion of the Court).

And, in 1900, Justice Fuller disposed of a contention raised in *Carter v. Roberts, supra* (1900), that "status jurisdiction" was confusing to civilians, who, by entering the service, departed from the rules of one justice system to enter another:

Every officer, before he enters on the duties of his office, subscribes to these articles, and places himself within the power of courts-martial to pass on any offense which he may have committed in contravention of them. Courts-martial are lawful tribunals, with authority to finally determine any case over which they have jurisdiction...

*Id.,* at 497–498, at 713, at 862 (1900).

Two years later, after Justice Fuller had become Chief Justice Fuller, he described the rule against revision of courts-martial sentences as "salutary:"

the salutary rule that the sentence of courts-martial, when affirmed by the military tribunal of last resort, cannot be revised by the civil courts save only when

void because of an absolute want of power, and not merely voidable because of the defective exercise of power possessed. *Id.,* at 401, at 195, at 253 (1902). *Cited in Fowler v. Wilkinson,* 353 U.S. 583, at 584, 77 S.Ct. 1035, at 1036, 1 L.Ed.2d 1054, at 1055–1056 (1957).

In 1946, Justice Rutledge, in an early World War II case, decided some 80 years following *Ex Parte Milligan, supra,* and 44 years following *Carter v. McClaughry, supra,* summarized the status of then existing perceptions of the differences in law applicable to our military and civilian societies, as follows:

> Moreover, in the case of one entering the armed forces, the loss of civil rights, including those of recourse to .the civil courts other than by way of habeas corpus, results altogether by virtue of the change from civilian to military status... That compulsion arises from the necessity for preventing interruption of military processes by intrusion of the civil courts beyond the essential minimum of keeping open the habeas corpus channel to show that the military authority has exceeded its jurisdiction in dealing with the individual. It is on this foundation that the forfeiture of other civil remedies is held to take place.

*Gibson v. United States, supra,* at 358–359, 311, 346 (1946).

The arrival of the 1950's, however, brought with it two distinct factors that were to substantially reshape our society's perceptions of the propriety of such regimentated Congressional control over our nation's military population.

The first of these centered around public reaction to the involvement of our armed forces in World War II. The armies, which had been composed primarily of young men who immediately returned to civilian life, had served the nation well. Each town welcomed its returning heros as idols; these civilian soldiers were no part of the fearful spectre of a standing army that had nearly paralyzed the nation's founders with fear; to the contrary, they were nice "boys next door," the pride of their home town communities.

The only lingering questions of the civilian population centered around why such fine youngsters had been subjected to such unfamiliar authoritarian regimentation while they were members of the armed forces. Did the fact that they had willingly gone to war to protect their country, somehow subject them to a deprivation of the very freedom they were fighting for? Certainly, many of the former civilian soldiers felt this way, and their feelings quickly spread through the communities to which they returned.

As a direct result, Congress began working on a completely new Uniform Code of Military Justice. One which upon its enactment in 1950, not only, legislatively provided servicemen with considerably more guarantees, similar to those provided civilians by the Bill of Rights, than American servicemembers had ever enjoyed in the past, but also provided for the review of all infamous convictions by a legislatively created Court of Military Appeals, composed of civilian judges.

The second factor consisted of the fact, that, beginning on 5 October 1953, the date Earl Warren was sworn in as .its Chief Justice, the Supreme Court entered an expansive sixteen year phase of unprecedented civil libertarianism.

The Court, itself, acknowledged the former of these two factors.

First, through the pen of Chief Justice Vincent in 1953:

> Only recently the Articles of War were completely revised, and thereafter, in conformity with its purpose to integrate the armed services, Congress established a Uniform Code of Military Justice applicable to all members of the military establishment. These enactments were prompted by a desire to meet objections and criticisms lodged against court-martial procedures in the aftermath of World War II. Nor was this a patchwork effort to plug loopholes in the old system of military justice. The revised Articles and the new Code are the result of painstak-

ing study; they reflect an effort to reform and modernize the system—from top to bottom.

*Burns v. Wilson,* 346 U.S. 137, at 140–141, 73 S.Ct. 1045, at 1048, 97 L.Ed. 1508, at 1514 (1953).

And second, four years later, from the hand of Justice Black, writing in *Reid v. Covert, supra:*

> We recognize that a number of improvements have been made in military justice recently by engrafting more and more of the methods of civilian courts on courts-martial. In large part these ameliorations stem from the reaction of civilians, who were inducted during the two World Wars, to their experience with military justice.

*Id.,* 37, at 1241, 1174 (1957).

The validity of the second factor can easily be retrospectively demonstrated at this point in time by simply examining representative sentences from two military decisions issued by the Court during its period of expansive civil libertarianism.

> Traditionally, military justice has been a rough form of justice emphasizing summary procedures, speedy convictions and stern penalties with a view to maintaining obedience and fighting fitness in the ranks.

*Id.,* at 35–36, at 1240, at 1174 (1957).

> A court-martial is not yet an independent instrument of justice, but remains to a significant degree a specialized part of the overall mechanism by which military discipline is preserved.

\* \* \* \* \* \*

As recently stated: "None of the travesties of justice perpetrated under the UCMJ is really very surprising, for military law has always been and continues to be primarily an instrument of discipline, not justice." Glasser, *Justice and*

*Captain Levy,* 12 Columbia Forum 46, 498 (1969).

*O'Callahan v. Parker,* supra, at 265, 266, at 1686–1687, 1687, at 297, 298 (1969) (Justice Douglas, Opinion of the Court).

Obviously, the Court, during the 1950s and '60s, was anxious to extend as many civilian liberties to members of the armed forces as possible. But faced with the irrefutable logic of those axioms set forth at the outset of this opinion, the Court's membership was left with little to do other than express their individual contempt for the quality of justice dispensed in the military justice system. Nevertheless, as just demonstrated, they at the same time, grudgingly, acknowledged that a separate system of military justice would probably be forever necessary to protect the additional liberties bestowed upon the nation's civilian population.

Not only was the Court unable to merge the two systems, they were unable to even gain sufficient consensus among themselves to directly extend the full scope of any specific provision of the Bill of Rights to service personnel.[3] The cases continued to emphasize the underlying factors requiring a separate military justice system, throughout the 1950s and 60s.

The first two significant decisions the Court issued during these two decades, predating the arrival of Chief Justice Warren, were released in 1953.

In *Orloff v. Willoughby, supra,* an officer case, Justice Jackson, hinting broadly that it is of paramount importance that personnel of the armed services must remain completely responsive to orders of their commander-in-chief for the protection of this country's citizenry as well as for maintenance of an effective external fighting force, wrote that:

> the implied "threats" of broadened Constitutional interpretation should Congress fail to legislate, or the Court of Military Appeals decline to interpret, a greater number of civil rights for servicemen, that were conveyed by the contemptuous language regarding military justice used in many of the Court's opinions.

---

**3.** Three types of indirect activity did, of course, result in significantly greater rights for servicemen; to wit: (1) those decisions, which to a greater or lesser degree, have bestowed vaguely defined portions of specific elements of the Bill of Rights to servicemen, (2) the creation of the concept of "military due process," and (3)

It is obvious that the commissioning of officers in the Army is a matter of discretion within the province of the President as Commander in Chief.

\*    \*    \*    \*    \*    \*

The President's commission to Army officers recites that "reposing special trust and confidence in the patriotism, valor, fidelity, and abilities" of the appointee he is named to the specified rank during the pleasure of the President.

\*    \*    \*    \*    \*    \*

[J]udges are not given the task of running the Army. The responsibility for setting up channels through which such grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates. The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters. [Emphasis added.]

*Id.,* at 90, 91, 93–94, at 538, 539, 540, at 847–848, 848, 849 (1953). *Cited in, Parker v. Levy, supra,* at 744, at 2556, at 451 (1974) (Justice Rehnquist, Opinion of the Court); *Department of the Air Force v. Rose,* 425 U.S. 352, at 367, 96 S.Ct. 1592, at 1602, 48 L.Ed.2d 11, at 25 (1976) (Justice Brennan, Opinion of the Court); *Rostker v. Goldberg, supra,* at 70–71, at 2654–2655, at 490 (1981).

In *Burns v. Wilson, supra* (1953), the first case since *Ex parte Milligan, supra* (1866), to discuss potential limited applicability of portions of the Bill of Rights to service personnel, Chief Justice Vinson, nevertheless, emphatically reiterated that:

Military Law, like state law, is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment. This Court has played no role in its development; we have exerted no supervisory power over the courts which enforce it; the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty, and the civil courts are not the agencies which must determine the precise balance to be struck in this adjustment. The Framers expressly entrusted that task to Congress.

*Burns v. Wilson, supra,* at 140, at 1047–1048, at 1513–1514 (1953). *Cited in, Fowler v. Wilkinson, supra,* at 584, at 1035–1036, at 1055 (1957); *Parker v. Levy, supra,* at 744, at 2556, at 451 (1974) (Justice Rehnquist, Opinion of the Court); *Schlesinger v. Councilman,* 420 U.S. 738, at 746, 95 S.Ct. 1300, at 1307, 43 L.Ed.2d 591, at 602 (1975); *Middendorf v. Henry,* 425 U.S. 25, at 43, 96 S.Ct. 1281, at 1291, 47 L.Ed.2d 556, at 569 (1976).

Two years later, in the first case to actually carry language contemptuous of the military justice system, Justice Black was careful to point out that:

[I]t is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise.

\*    \*    \*    \*    \*    \*

Court-martial jurisdiction sprang from the belief that within the military ranks there is need for a prompt, ready-at-hand means of compelling obedience and order.

*United States ex rel. Toth v. Quarles,* 350 U.S. 11, at 17, 22, 76 S.Ct. 1, at 5, 8, 100 L.Ed. 8, at 14, 17 (1955). *Cited in, Reid v. Covert, supra,* at 35, at 1240, at 1173–1174 (1957); *Parker v. Levy, supra,* at 743, at 2555–2556, at 451 (1974) (Justice Rehnquist, Opinion of the Court); *Schlesinger v. Ballard, supra,* at 510, at 578, at 619 (1975); *Schlesinger v. Councilman, supra,* at 757, at 1313, at 608 (1975); *Greer v. Spock,* 424 U.S. 828, at 837–838, 96 S.Ct. 1211, at 1217, 47 L.Ed.2d 505, at 514 (1976) (Justice Stewart, Opinion of the Court); *Middendorf v. Henry, supra,* at 46, at 1293, at 571 (1976) (Justice Rehnquist, Opinion of the Court); *Rostker v. Goldberg, supra,* at 70–71, at 2654, at 490 (1981).

Again, in 1957, Justice Black reiterated justifications for the two distinctly different justice systems:

It must be emphasized that every person who comes within the jurisdiction of courts-martial is subject to military law—law that is substantially different from the law which governs civilian society. Military law is, in many respects, harsh law which is frequently cast in very sweeping and vague terms. It emphasizes the iron hand of discipline more that [sic.] it does the even scales of justice.

\* \* \* \* \* \*

[I]nherent differences in values and attitudes . . . separate the military establishment from civilian society. In the military, by necessity, emphasis must be placed on the security and order of the group rather than on the value and integrity of the individual.

*Reid v. Covert, supra,* at 38–39, at 1241–1242, at 1175–1176 (1957).

As the Court's expansion of civil libertarian concepts peaked in 1969, the year Chief Justice Warren was replaced by Chief Justice Burger, so, also, did the Court's contemptuous attitude toward the military justice system. In *O'Callahan v. Parker, supra,* (1969), Justice Douglas, writing for the Court, actually went to the extent of quoting a law review article that had irresponsibly described law dispensed under the UCMJ as a "travesty of justice." He then added in words of his own, that "a court-martial is not yet an independent instrument of justice." It was also this case, in which he attempted to severely limit the jurisdiction of the military justice system, by stripping military courts of the "status jurisdiction" over active duty military personnel, and substituting instead a nebulous requirement of "service connection." In doing so he reversed 83 years of Court precedent, dating back to *Smith v. Whitney, supra* (1886).

According to Justice Douglas, in *O'Callahan:*

[T]he justification for such a system rests on the special needs of the military, and history teaches that expansion of military discipline beyond its proper domain carries with it a threat to liberty.

*O'Callahan v. Parker, supra,* at 265, at 1687, at 297–298 (1969) (Justice Douglas, Opinion of the Court).

Most significantly, however, even here, at the high water mark of criticism directed by the Court at the military justice system, the logic of the axioms underlying the necessity of a separate system of justice for the military continued to compel their recognition:

The constitution gives Congress power to "make Rules for the Government and Regulation of the land and naval Forces," Art. I, sec. 8, cl. 14, and it recognizes that the exigencies of military discipline require the existence of a special system of military courts in which not all of the specific procedural protections deemed essential in Art. III trials need apply. . . . The result has been the establishment and development of a system of military justice with fundamental differences from the practices in the civilian courts.

\* \* \* \* \* \*

That a system of specialized military courts, proceeding by practices different from those obtaining in the regular courts and in general less favorable to defendants, is necessary to an effective national defense establishment, few would deny.

*Id.,* at 261–262, 265, at 1685, 1687, at 295–296, 297 (1969) (Justice Douglas, Opinion of the Court).

In view of the successively expanding definitions of the term "service connected," by which the Court in *Relford v. Commandant,* 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971) and *Schlesinger v. Councilman, supra,* (1975) effectively returned to the military system of justice much of the jurisdiction that *O'Callahan* had initially appeared to take away from it, the remarks of the dissenting justices in that case remain particularly relevant:

The United States has a vital interest in creating and maintaining an armed force of honest, upright, and well-disciplined persons, and in preserving the reputation, morale, and integrity of the military services. Furthermore, because its personnel

must, perforce, live and work in close proximity to one another, the military has an obligation to protect each of its members from the misconduct of fellow servicemen. The commission of offenses against the civil order manifests qualities of attitude and character equally destructive of military order and safety. The soldier who acts the part of Mr. Hyde while on leave is, at best, a precarious Dr. Jekyll when back on duty...

A soldier's misconduct directed against civilians, moreover, brings discredit upon the service of which he is a member...

The Government, thus, has a proper concern in keeping its own house in order, by deterring members of the armed forces from engaging in criminal misconduct on or off the base, and by rehabilitating offenders to return them to useful military service.

*O'Callahan v. Parker,* supra, at 281–282, at 1695–1696, at 307 (1969) (Justice Harlan, whom Justice Stewart and Justice White join, dissenting.)

For whatever the reason, the full impact of O'Callahan was exceedingly short lived. Just 14 days later, Justice Harlan, spoke for a majority of the same Court, when he returned to the same basic justification *Smith v. Whitney, supra,* had used in originally creating "status jurisdiction" to justify the continued necessity of a separate and distinct military justice system:

In reviewing military decisions, we must accommodate the demands of individual rights and the social order in a context which is far removed from those which we encounter in the ordinary run of civilian litigation, whether state or federal. In doing so, we must interpret a legal tradition which is radically different from that which is common in civil courts.

\* \* \* \* \* \*

[I]f we were to reach the merits of petitioner's claim for relief pending his military appeal, we would be obliged to interpret extremely technical provisions of the Uniform Code which have no analogs in civilian jurisprudence, and which have not even been fully explored by the Court

of Military Appeals itself. There seems little reason to blaze a trail on unfamiliar ground when the highest military court stands ready to consider petitioner's arguments.

*Noyd v. Bond,* 395 U.S. 683, at 694, 696, 89 S.Ct. 1876, at 1883, 1884, 23 L.Ed.2d 631, at 643, 644 (1969). *Cited in Parisi v. Davidson,* 405 U.S. 34, at 51, 92 S.Ct. 815, at 825, 31 L.Ed.2d 17, at 33 (1972).

And it was just two years following *O'Callahan,* that Justice Blackmun, penned the first of two cases, reducing the severity of O'Callahan's apparent jurisdictional implications. Borrowing from factors Justice Douglas had mentioned as possibly relevant to determining whether an offense is "service connected" for jurisdictional purposes, the Court's opinion in *Relford v. Commandant, supra,* stressed the *individual* importance of such factors in determining the requisite "service connection" necessary for a determination of the same.

We stress: ... (b) The responsibility of the military commander for maintenance of order in his command and his authority to maintain that order... (d) The conviction that Art. I sec. 8, cl. 14, vesting in the Congress the power "To make Rules for the Government and Regulation of the land and naval Forces," means, in appropriate areas beyond the purely military offense, more than the mere power to arrest a serviceman offender and turn him over to the civil authorities. The term "Regulation" itself implies, for those appropriate cases, the power to try and to punish. (e) The distinct possibility that civil courts, particularly nonfederal courts, will have less than complete interest, concern, and capacity for all the cases that vindicate the military's disciplinary authority within its own community...

*Id.,* at 367–368, at 656, at 110 (1971).

In 1972, the Court, continued the resurrection of its *Smith v. Whitney* theme, by again asserting that the civilian judiciary continues to lack the very expertise in peculiarly military matters that has always, in the past, necessitated a separate military justice system. According to Justice Stewart:

While we have stated in the past that special deference is due the military decisionmaking process, *Gusik v. Schilder,* 340 U.S. 128 [71 S.Ct. 149, 95 L.Ed. 146], this is so neither because of "comity, nor the sanctity of the Executive Branch, but because of concern for the effect of judicial intervention on morale and military discipline, and because of the civilian judiciary's general unfamiliarity with "extremely technical provisions of the Uniform Code [of Military Justice] which have no analogs in civilian jurisprudence," *Noyd v. Bond, supra,* 395 U.S. at 696, 89 S.Ct. at 1884.

*Parisi v. Davidson, supra,* at 51, at 825, at 33 (1972).

Two years later, in 1974, the case of *Parker v. Levy, supra,* provided us with the Court's most in-depth look to date at its own historical rulings on the constitutional justification for a separate military justice system. Reaffirming the legitimate role of, and necessity for, the UCMJ's general articles, Justice Rehnquist, speaking for the Court's majority, asserted:

> This court has long recognized that the military is, by necessity, a specialized society separate from civilian society. We have also recognized that the military has, again by necessity, developed laws and traditions of its own during its long history. The differences between the military and civilian communities result from the fact that "it is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise." *United States ex rel. Toth v. Quarles,* 350 U.S. 11, 17 [76 S.Ct. 1, 5, 100 L.Ed. 8] (1955)... We have also recognized that a military officer holds a particular position of responsibility and command in the Armed Forces...
>
> Just as military society has been a society apart from civilian society, so "[m]ilitary law ... is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment." *Burns v. Wilson, supra* [346 U.S.], at 140 [73 S.Ct. at 1048]. And to maintain the discipline essential to perform its mission effectively, the military

has developed what "may not unfitly be called the customary military law" or "general usage of the military service." *Martin v. Mott* [25 U.S. 19], 12 Wheat. 19, 35 [6 L.Ed. 537], (1827)...

\*      \*      \*      \*      \*      \*

Decisions of this Court during the last century have recognized that the long-standing customs and usages of the services impart accepted meaning to the seemingly imprecise standards of Arts. 133 and 134.

\*      \*      \*      \*      \*      \*

The Court of Claims decision which the Court affirmed in *Fletcher* stressed the military's "higher code termed honor, which holds its society to stricter accountability and with which those trained only in civilian law are unfamiliar." In *Swaim v. United States,* 165 U.S. 553 [17 S.Ct. 448, 41 L.Ed. 823] (1897) ... the Court said:

> "[T]his is the very matter that falls within the province of courts-martial, and in respect to which their conclusions cannot be controlled or reviewed by the civil courts."

\*      \*      \*      \*      \*      \*

That Code [the Uniform Code of Military Justice] cannot be equated to a civilian criminal code. It, and the various versions of the Articles of War which have preceded it, regulate aspects of the conduct of members of the military which in the civilian sphere are left unregulated. While a civilian criminal code carves out a relatively small segment of potential conduct and declares it criminal, the Uniform Code of Military Justice essays more varied regulation of a much larger segment of the activities of the more tightly knit military community.

\*      \*      \*      \*      \*      \*

In short, the Uniform Code of Military Justice regulates a far broader range of the conduct of military personnel than a typical state criminal code regulates of the conduct of civilians...

... [There is a] different relationship of the Government to members of the military. It is not only that of lawgiver to citizen, but also that of employer to employee. Indeed, unlike the civilian situation, the Government is often employer, landlord, provisioner, and lawgiver rolled into one. That relationship also reflects the different purposes of the two communities... While members of the military community enjoy many of the same rights and bear many of the same burdens as do members of the civilian community, within the military community there is simply not the same autonomy as there is in the larger civilian community. The military establishment is subject to the control of the civilian Commander in Chief and the civilian departmental heads under him, and its function is to carry out the policies made by those civilian superiors.

\* \* \* \* \* \*

For the reasons which differentiate military society from civilian society, we think Congress is permitted to legislate both with greater breadth and with greater flexibility when prescribing the rules by which the former shall be governed than it is when prescribing rules for the latter.

\* \* \* \* \* \*

The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it.... The United States Court of Military Appeals has sensibly expounded the reason for this different application of First Amendment doctrines in its opinion in *United States v. Priest,* 21 U.S.C.M.A., at 570, 45 C.M.R., at 344:

"In the armed forces some restrictions exist for reasons that have no counterpart in the civilian community. Disrespectful and contemptuous speech, even advocacy of violent change, is tolerable in the civilian community, for it does not directly affect the capacity of the Government to discharge its responsibilities unless it both is directed to inciting imminent lawless action and is likely to produce such action. *Brandenburg v. Ohio,* [395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969)]. In military life, however, other considerations must be weighed. The armed forces depend on a command structure that at times must commit men to combat, not only hazarding their lives but ultimately involving the security of the Nation itself. Speech that is protected in the civil population may nonetheless undermine the effectiveness of response to command."

*Parker v. Levy, supra,* at 743–744, 746–747, 748, 749, 750–751, 756, 758–759, at 2555–2556, 2557, 2558, 2558, 2559, 2561–2562, 2563, at 450–451, 452, 453, 454, 454–455, 458, 459 (1974) (Justice Rehnquist, Opinion of the Court). *Cited in Schlesinger v. Councilman, supra,* at 746, 757, at 1307, 1313, at 602, 608 (1975); *Greer v. Spock, supra,* at 844, at 1220, at 518 (1976) (Justice Powell, concurring); *Middendorf v. Henry, supra,* at 38, at 1289, at 566, (1976) (Justice Rehnquist, Opinion of the Court); *Id.,* at 49–50, at 1294–1295, at 572–573 (1976) (Justice Powell, with whom Justice Blackmun joins, concurring); *Department of the Air Force v. Rose, supra,* at 367–368, at 1592, at 25 (1976) (Justice Brennan, Opinion of the Court); *Brown v. Glines,* 444 U.S. 348, 354, 100 S.Ct. 594, at 599, 62 L.Ed.2d 540, at 547–548 (1980) (Justice Powell, Opinion of the Court); *Rostker v. Goldberg, supra,* at 66, at 2652, at 486 (1981).

Justice Blackmun, taking advantage of the depth in which the majority analyzed the principles underlying the military system of justice, philosophically, added:

... [W]hat is at issue here are concepts of "right" and "wrong" and whether the civil law can accommodate, in special circumstances, a system of law which expects more of the individual in the context of a broader variety of relationships than one finds in civilian life.

... [H]owever unfortunate it may be, it is still necessary to maintain a disciplined and obedient fighting force.

... The subtle airs that govern the command relationship are not always capable of specification. The general articles are essential not only to punish patently criminal conduct, but also to foster an orderly and dutiful fighting force.

\*      \*      \*      \*      \*      \*

In *Fletcher v. United States,* 26 Ct.Cl. 541 (1891), the Court of Claims reviewed a court-martial finding that a Captain Fletcher was guilty of conduct unbecoming an officer... The sentiments expressed by Judge Nott, writing for the court in that case, are just as applicable to the case we decide today.

> ... "We learnt as law students in Blackstone that there are things which are *malum in se* and, in addition to them, things which are merely *malum prohibitum;* but unhappily in the affairs of real life we find that there are many things which are *malum in se* without likewise being *malum prohibitum.* In military life there is a higher code termed honor, which holds its society to stricter accountability; and it is not desirable that the standard of the Army shall come down to the requirements of a criminal code." *Id.,* at 562–563.

Relativistic notions of right and wrong, or situation ethics, as some call it, have achieved in recent times a disturbingly high level of prominence in this country, both in the guise of law reform, and as a justification of conduct that persons would normally eschew as immoral and even illegal.... The law should, in appropriate circumstances, be flexible enough to recognize the moral dimension of man and his instincts concerning that which is honorable, decent and right.

*Parker v. Levy, supra,* at 763–765, at 2565–2566, at 461–463 (1974) (Justice Blackmun, with whom The Chief Justice joins, concurring).

And, Justice Stewart, dissenting because the general articles are "overly vague," carefully noted at the conclusion of his opinion, that:

> I do not for one moment denigrate the importance of our inherited tradition that the commissioned officers of our military forces are expected to be men of honor, nor do I doubt the necessity that servicemen generally must be orderly and dutiful. An efficient and effective military organization depends in large part upon the character and quality of its personnel, particularly its leadership. The internal loyalty and mutual reliance indispensable to the ultimate effectiveness of any military organization can exist only among people who can be counted on to do their duty.

*Id.,* at 789, at 2577–2578, at 476 (1974) (Justice Stewart, with whom Justice Douglas and Justice Brennan join, dissenting.)

Since *Parker v. Levy,* every decision of the Court concerning the military justice system has continued to emphasize the current relevance of these same constitutional axioms.

In *Schlesinger v. Ballard, supra,* Justice Stewart, this time writing the opinion of the majority for the Court, high-lighted both the Constitution and court precedent:

> This Court has recognized that "it is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise." *Toth v. Quarles,* 350 U.S. 11, 17 [76 S.Ct. 1, 5, 100 L.Ed. 8]. See also *Orloff v. Willoughby,* 345 U.S. 83, 94 [73 S.Ct. 534, 540, 97 L.Ed. 842]. The responsibility for determining how best our Armed Forces shall attend to that business rests with Congress, see U.S. Const., Art. I, sec. 8, cls. 12–14, and with the President.

*Id.,* at 510, at 578, at 619 (1975). *Cited in Rostker v. Goldberg, supra,* at 70–71, at 2654, at 490 (1981).

Justice Powell, expressing the majority view in *Schlesinger v. Councilman, supra,* wrote that:

> To prepare for and perform its vital role, the military must insist upon a respect for duty and a discipline without counterpart in civilian life. The laws and traditions governing that discipline have a long history; but they are founded on

unique military exigencies as powerful now as in the past. Their contemporary vitality repeatedly has been recognized by Congress.

In enacting the Code, Congress attempted to balance these military necessities against the equally significant interest of ensuring fairness to servicemen charged with military offenses, and to formulate a mechanism by which these often competing interests can be adjusted.

*Id.,* at 757–758, at 1313, at 609 (1975). *Cited in Middendorf v. Henry, supra,* at 50, note 2, at 1295, note 2, 573, note 2 (1976) (Justice Powell, with whom Justice Blackmun joins, concurring); *Brown v. Glines, supra,* at 354, at 599, at 547 (1980).

In *Greer v. Spock, supra,* (1976), it was, again, Justice Stewart speaking for the Court, who said:

One of the very purposes for which the Constitution was ordained and established was to "provide for the common defence," [U.S. Const. Preamble. See also U.S. Const., Art. I, sec. 8; Art. II, sec. 2.] and this Court over the years has on countless occasions recognized the special constitutional function of the military in our national life, a function both explicit and indispensible.

\* \* \* \* \* \*

There is nothing in the Constitution that disables a military commander from acting to avert what he perceives to be a clear danger to the loyalty, discipline, or morale of troops on the base under his command.

*Id.,* at 837, 840, at 1217, 1218, at 514, 515 (1976) (Justice Stewart, Opinion of the Court). *Cited in Brown v. Glines, supra,* at 353, at 598–599, at 546–547 (1980).

Concurring, but writing separately in *Greer v. Spock,* Justice Powell, noted the confusion arising from the Court's efforts to apply democratic concepts to the basically authoritarian military justice structure:

Fort Dix is not only an area of property owned by the Government and dedicated to a public purpose. It is also the enclave of a system that stands apart from and outside of many of the rules that govern ordinary civilian life in our country:

"A military organization is not constructed along democratic lines and military activities cannot be governed by democratic procedures. Military institutions are necessarily far more authoritarian; military decisions cannot be made by vote of the interested participants... [T]he existence of the two systems [military and civilian does not] mean that constitutional safeguards ... have no application at all within the military sphere. It only means that the rules must be somewhat different." T. Emerson, The System of Freedom of Expression 57 (1970).

... We also must consider their functional and symbolic incompatibility with the "specialized society separate from civilian society," *Parker v. Levy,* 417 U.S. 733, 734 [94 S.Ct. 2547, 2551, 41 L.Ed.2d 439] (1974), that has its home on the base.

*Id.,* at 843–844, at 1220, at 517–518 (1976) (Justice Powell, concurring).

Apparently, once again, disappointed by the majority's failure to directly address a constitutional issue, Justice Powell wrote another concurring opinion in *Middendorf v. Henry, supra.* This time, joined by Justice Blackmun, he said:

Court-martial proceedings, as a primary means for the regulation and discipline of the Armed Forces, were well known to the Founding Fathers. The procedures in such courts were never deemed analogous to, or required to conform with, procedures in civilian courts. One must ignore history, tradition, and practice for two centuries to read into the Constitution, at this late date, a requirement for counsel in the discipline of minor violations of military law.

... [S]ince the founding of the Republic Congress has enacted special legislation applicable only to the Armed Services, including the current provisions in the Uniform Code of Military Justice for summary courts-martial.

*Id.,* at 49–51, at 1294–1295, at 572–573 (1976) (Justice Powell, with whom Justice Blackmun joins, concurring.)

In *Department of the Air Force v. Rose, supra,* it was Justice Brennan, who wrote for the majority. He emphasized that:

What we have said of the military in other contexts has equal application here; it "constitutes a specialized community governed by a separate discipline from that of the civilian," *Orloff v. Willoughby,* 345 U.S. 83, 94 [73 S.Ct. 534, 540, 97 L.Ed. 842] (1953), in which the internal law of command and obedience invests the military officer with "a particular position of responsibility." *Parker v. Levy,* 417 U.S. 733, 744 [94 S.Ct. 2547, 2556, 41 L.Ed.2d 439] (1974). Within this discipline, the accuracy and effect of a superior's command depends critically upon the specific and customary reliability of subordinates, just as the instinctive obedience of subordinates depends upon the unquestioned specific and customary reliability of the superior. The importance of these considerations to the maintenance of a force able and ready to fight effectively renders them undeniably significant to the public role of the military. Moreover, the same essential integrity is critical to the military's relationship with its civilian direction:

\*    \*    \*    \*    \*    \*

The Honor Reference Handbook of the Air Force Cadet Wing 1 (1970) recites:

"Former Secretary of War, Newton Baker, said, '. . . the inexact or untruthful soldier trifles with the lives of his fellow men and with the honor of his government. . . .' The young officer needs to be able to trust his men as does any commander. In these times of expensive and increasingly complex weapons systems, the officer must rely on fellow officers and airmen for his own safety and the safety of his men." App. 47.

Id., at 367–368, 368, note 6, at 1602, 1602, note 6, at 25, 25, note 6 (1976).

With the arrival of the 80s, it appears that no question remains concerning the constitutionality of separate and distinct justice systems for this nation's military and civilian populations.

Because the right to command and the duty to obey ordinarily must go unquestioned, this Court long ago recognized that the military must possess substantial discretion over its internal discipline. See, *e.g., Schlesinger v. Councilman,* 420 U.S. 738 [95 S.Ct. 1300, 43 L.Ed.2d 591] (1975); *Parker v. Levy,* 417 U.S. 733 [94 S.Ct. 2547, 41 L.Ed.2d 439] (1974); *Burns v. Wilson,* 346 U.S. 137 [73 S.Ct. 1045, 97 L.Ed. 1508] (1953); *Orloff v. Willoughby,* 345 U.S. 83 [73 S.Ct. 534, 97 L.Ed. 842] (1953); *In re Grimley,* 137 U.S. 147 [11 S.Ct. 54, 34 L.Ed. 636] (1890).

\*    \*    \*    \*    \*    \*

Both Congress and this Court have found that the special character of the military requires civilian authorities to accord military commanders some flexibility in dealing with matters that affect internal discipline and morale. See, *e.g., Middendorf v. Henry,* 425 U.S. 25, 37–40, 43 [96 S.Ct. 1281, 1288–90, 1291, 47 L.Ed.2d 556] (1976); *id.,* at 49–51 [96 S.Ct. at 1294–95] (Powell, J., concurring); *Parker v. Levy,* 417 U.S., at 756; *Orloff v. Willoughby,* 345 U.S., at 93–94.

*Brown v. Glines, supra,* at 357, 360, at 601, 602, at 549, 551 (1980).

The case arises in the context of Congress' authority over national defense and military affairs, and perhaps in no other area has the Court accorded Congress greater deference.

\*    \*    \*    \*    \*    \*

. . . "The constitutional power of Congress to raise and support armies and to make all laws necessary and proper to that end is broad and sweeping." *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968).

\*    \*    \*    \*    \*    \*

[W]e must be particularly careful not to substitute our judgment of what is desirable for that of Congress, or our own evaluation of evidence for a reasonable evaluation by the Legislative Branch.

*Rostker v. Goldberg, supra,* at 64–65, 68, at 2651–2652, 2653, at 486, 488 (1981).

In this case, defense asserts that (1), the accused should not have been tried for consensual sodomy or smoking marihuana while on active duty within the boundaries of the state of New York, because neither consensual sodomy nor smoking marihuana are crimes under the criminal statutes of the state of New York, and (2), the accused's sentence for the remaining convictions, being more severe than would have been meted out by any civilian "court, anywhere," this court should exercise its clemency powers so as to make the sentence conform to such civilian court punishment "standards."

Such arguments, although sensible with regard to the civilian justice system, in which all attornies, both military and civilian, are schooled, totally ignores the scheme that both underlies and dictates this nation's constitutional division between our military and civilian systems of government and justice.

The accused, was an active duty officer, subject to the laws of Congress contained in the Uniform Code of Military Justice. As such, she was a member of a specialized community governed by a separate discipline from that of the civilian community. Her primary business was to be ready to fight a war should the freedom of her nation be jeopardized. Specifically, as an officer commissioned by the President, it was her job to maintain a command relationship with her subordinates that would effectively permit her to perform her particular role in effectively providing "for the common defense." Simultaneously, she was to assure that her subordinates would forever be responsible to civilian control, exercised over them by the President, himself. To effectively perform these functions it was her duty to insist that her subordinates display a respect for command, duty and disciplinary rules, without counterpart in civilian life. It was her responsibility to enforce this internal law of command and obedience.

She responded to these awesome jobs, duties and responsibilities by not only violating these disciplinary rules, herself, but by encouraging, aiding and abetting her subordinates to violate the rules with her. She engaged her subordinates in homosexual acts in which she participated and provided them with the reflex slowing marihuana she encouraged them to use.

True, by committing these acts, she did personally violate the civilian laws of at least some states which prohibit consensual sodomy and marihuana use. But, looming of far greater significance is the fact that by committing these acts in the military community, she, as a commissioned officer, not only destroyed her subordinate's instinctive respect and obedience for her, herself, but, in all probability, destroyed their instinctive respect and obedience for other officers and for the entire military system as well.

Certainly, had the accused been tried on these identical charges in a civilian court, which would probably have been unfamiliar with the laws and traditions developed by the military during its long history, it is likely the court would not have had full capacity to recognize the complete impact of damage to the national security resulting from such conduct on the part of a commissioned officer. Consequently, the military's disciplinary authority probably would not have been adequately vindicated.

However, because of our wise Founding Fathers, and the faithfulness of Supreme Court decisions that have preserved the constitutional separation of our military and civilian justice systems, such was not the case. The accused was tried by a military court-martial, that fully appreciated the seriousness of her offenses in a military context. Her sentence was entirely appropriate, in view of her offenses, and properly vindicated the military's disciplinary authority.

I concur with my brothers, and vote to affirm.